## TENNEY ET AL. *v.* BRANDHOVE.

No. 338.   Argued March 1, 1951.—Decided May 21, 1951.

368

*Harold C. Faulkner* argued the cause for petitioners. With him on the brief were *Edmund G. Brown,* Attorney General of California, *Bert W. Levit,* Chief Deputy Attorney General, *Ralph N. Kleps* and *A. C. Morrison.*

*Martin J. Jarvis* and *Richard O. Graw* argued the cause for respondent. With them on the brief was *George Olshausen.*

Briefs in support of petitioners were filed as *amici curiae* as follows: A joint brief for the States of Florida, by *Richard W. Ervin,* Attorney General; Georgia, by *Eugene Cook,* Attorney General; Idaho, by *Robert E. Smylie,* Attorney General; Iowa, by *Robert L. Larson,* Attorney General; Kansas, by *Harold R. Fatzer,* Attorney General; Kentucky, by *A. E. Funk,* Attorney General; Maine, by *Alexander A. LaFleur,* Attorney General; Maryland, by *Hall Hammond,* Attorney General; Michigan, by *Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara,* Assistant Attorney General; Nevada, by *W. T. Mathews,* Attorney General; New York, by *Nathaniel L. Goldstein,* Attorney General; North Carolina, by *Harry McMullan,* Attorney General; North Dakota, by *Elmo T. Christianson,* Attorney General; Ohio, by *C. William O'Neill,* Attorney General; Oregon, by *George Neuner,* Attorney General; Rhode Island, by *William E. Powers,* Attorney General; South Carolina, by *T. C. Callison,* Attorney General; Tennessee, by *Roy H. Beeler,* Attorney General; Texas, by *Price Daniel,* Attorney General, and *E. Jacobson,* Assistant Attorney General; Virginia, by *J. Lindsay Almond, Jr.,* Attorney General; Washington, by *Smith Troy,* Attorney General; Wisconsin, by *Vernon W. Thomson,* Attorney General; and Wyoming, by *Harry S. Harnsberger,* Attorney General; and a brief for the State of Wisconsin, by *Vernon W. Thomson,* Attorney General, and *Harold H. Persons* and *Roy G. Tulane,* Assistant Attorneys General.

Mr. Justice Frankfurter delivered the opinion of the Court.

William Brandhove brought this action in the United States District Court for the Northern District of California, alleging that he had been deprived of rights guaranteed by the Federal Constitution. The defendants are Jack B. Tenney and other members of a committee of the California Legislature, the Senate Fact-Finding Committee on Un-American Activities, colloquially known as the Tenney Committee. Also named as defendants are the Committee and Elmer E. Robinson, Mayor of San Francisco.

The action is based on §§ 43 and 47 (3) of Title 8 of the United States Code. These sections derive from one of the statutes, passed in 1871, aimed at enforcing the Fourteenth Amendment. Act of April 20, 1871, c. 22, §§ 1, 2, 17 Stat. 13. Section 43 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." R. S. § 1979, 8 U. S. C. § 43.

Section 47 (3) provides a civil remedy against "two or more persons" who may conspire to deprive another of constitutional rights, as therein defined.[1]

---

[1] R. S. § 1980 (par. Third), 8 U. S. C. § 47 (3):

"If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving

370

Reduced to its legal essentials, the complaint shows these facts. The Tenney Committee was constituted by a resolution of the California Senate on June 20, 1947. On January 28, 1949, Brandhove circulated a petition among members of the State Legislature. He alleges that it was circulated in order to persuade the Legislature not to appropriate further funds for the Committee. The petition charged that the Committee had used Brandhove as a tool in order "to smear Congressman Franck R. Havenner as a 'Red' when he was a candidate for Mayor of San Francisco in 1947; and that the Republican machine in San Francisco and the campaign management of Elmer E. Robinson, Franck Havenner's opponent, conspired with the Tenney Committee to this end." In view of the conflict between this petition and evidence previously given by Brandhove, the Committee asked local prosecuting officials to institute criminal proceedings against him. The Committee also summoned Brandhove to appear before them at a hearing held on January 29. Testimony was there taken from the Mayor of San Francisco, allegedly a member of the conspiracy. The plaintiff appeared with counsel, but refused to give testimony.

or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

For this, he was prosecuted for contempt in the State courts. Upon the jury's failure to return a verdict this prosecution was dropped. After Brandhove refused to testify, the Chairman quoted testimony given by Brandhove at prior hearings. The Chairman also read into the record a statement concerning an alleged criminal record of Brandhove, a newspaper article denying the truth of his charges, and a denial by the Committee's counsel—who was absent—that Brandhove's charges were true.

Brandhove alleges that the January 29 hearing "was not held for a legislative purpose," but was designed "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights of free speech and to petition the Legislature for redress of grievances, and also to deprive him of the equal protection of the laws, due process of law, and of the enjoyment of equal privileges and immunities as a citizen of the United States under the law, and so did intimidate, silence, deter, and prevent and deprive plaintiff." Damages of $10,000 were asked "for legal counsel, traveling, hotel accommodations, and other matters pertaining and necessary to his defense" in the contempt proceeding arising out of the Committee hearings. The plaintiff also asked for punitive damages.

The action was dismissed without opinion by the District Judge. The Court of Appeals for the Ninth Circuit held, however, that the complaint stated a cause of action against the Committee and its members. 183 F. 2d 121.[2] We brought the case here because important issues are raised concerning the rights of individuals and the power of State legislatures. 340 U. S. 903.

---

[2] The Court of Appeals affirmed the dismissal as to Robinson on the ground that he was not acting under color of law and that the complaint did not show him to be a member of a conspiracy. We have denied a petition to review this decision. 341 U. S. 936.

We are again faced with the Reconstruction legislation which caused the Court such concern in *Screws* v. *United States,* 325 U. S. 91, and in the *Williams* cases decided this term, *ante,* pp. 70, 97. But this time we do not have to wrestle with far-reaching questions of constitutionality or even of construction. We think it is clear that the legislation on which this action *is* founded does not impose liability on the facts before us, once they are related to the presuppositions of our political history.

The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries. As Parliament achieved increasing independence from the Crown, its statement of the privilege grew stronger. In 1523, Sir Thomas More could make only a tentative claim. Roper, Life of Sir Thomas More, in More's Utopia (Adams ed.) 10. In 1668, after a long and bitter struggle, Parliament finally laid the ghost of Charles I, who had prosecuted Sir John Elliot and others for "seditious" speeches in Parliament. Proceedings against Sir John Elliot, 3 How. St. Tr., 294, 332. In 1689, the Bill of Rights declared in unequivocal language: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 Wm. & Mary, Sess. 2, c. II. See *Stockdale* v. *Hansard,* 9 Ad. & El. 1, 113–114 (1839).

Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation. It was deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution. Article V of the Articles of Confederation is quite close to the English Bill of Rights: "Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress . . . ." Article I, § 6, of the Constitution pro-

vides: ". . . for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place."

The reason for the privilege is clear. It was well summarized by James Wilson, an influential member of the Committee of Detail which was responsible for the provision in the Federal Constitution. "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence." II Works of James Wilson (Andrews ed. 1896) 38. See the statement of the reason for the privilege in the Report from the Select Committee on the Official Secrets Acts (House of Commons, 1939) xiv.

The provision in the United States Constitution was a reflection of political principles already firmly established in the States. Three State Constitutions adopted before the Federal Constitution specifically protected the privilege. The Maryland Declaration of Rights, Nov. 3, 1776, provided: "That freedom of speech, and debates or proceedings, in the legislature, ought not to be impeached in any other court or judicature." Art. VIII. The Massachusetts Constitution of 1780 provided: "The freedom of deliberation, speech and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action, or complaint, in any other court or place whatsoever." Part The First, Art. XXI. Chief Justice Parsons gave the following gloss to this provision in *Coffin* v. *Coffin,* 4 Mass. 1, 27 (1808):

> "These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the

rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate; but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office; and I would define the article as securing to every member exemption from prosecution, for every thing said or done by him, as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules."

The New Hampshire Constitution of 1784 provided: "The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any action, complaint, or prosecution, in any other court or place whatsoever." Part I, Art. XXX.[3]

---

[3] In two State Constitutions of 1776, the privilege was protected by general provisions preserving English law. See S. C. Const., 1776, Art. VII; N. J. Const., 1776, Art. XXII. Compare N. C. Const., 1776, § XLV.

Three other of the original States made specific provision to protect legislative freedom immediately after the Federal Constitution was adopted. See Pa. Const., 1790, Art. I, § 17; Ga. Const., 1789, Art. I, § 14; Del. Const., 1792, Art. II, § 11. Connecticut and Rhode Island so provided in the first constitutions enacted to replace their uncodified organic law. Conn. Const., 1818, Art. Third, § 10; R. I. Const., 1842, Art. IV, § 5.

In New York, the Bill of Rights passed by the legislature on January 26, 1787, provided: "That the freedom of speech and debates, and proceedings in the senate and assembly, shall not be

It is significant that legislative freedom was so carefully protected by constitutional framers at a time when even Jefferson expressed fear of legislative excess.[4] For the loyalist executive and judiciary had been deposed, and the legislature was supreme in most States during and after the Revolution. "The legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex." Madison, The Federalist, No. XLVIII.

As other States joined the Union or revised their Constitutions, they took great care to preserve the principle that the legislature must be free to speak and act without fear of criminal and civil liability. Forty-one of the forty-eight States now have specific provisions in their Constitutions protecting the privilege.[5]

---

impeached or questioned in any court or place out of the senate or assembly." In Virginia, as well as in the other colonies, the assemblies had built up a strong tradition of legislative privilege long before the Revolution. See Clarke, Parliamentary Privilege in the American Colonies (1943), *passim*, especially 70 and 93 *et seq.*

[4] See Jefferson, Notes on the State of Virginia (3d Am. ed. 1801), 174–175. The Notes were written in 1781. See also, a letter from Jefferson to Madison, March 15, 1789, to be published in a forthcoming volume of The Papers of Thomas Jefferson (Boyd ed.): "The tyranny of the legislatures is the most formidable dread at present, and will be for long years." As to the political currents at the time the United States Constitution and the State Constitutions were formulated, see Corwin, The Progress of Constitutional Theory between the Declaration of Independence and the Meeting of the Philadelphia Convention, 30 Am. Hist. Rev. 511 (1925).

[5] Ala. Const., Art. IV, § 56; Ariz. Const., Art. IV, 2, § 7; Ark. Const., Art. V, § 15; Colo. Const., Art. V, § 16; Conn. Const., Art. Third, § 10; Del. Const., Art. II, § 13; Ga. Const., Art. III, § VII, par. III; Idaho Const., Art. III, § 7; Ill. Const., Art. IV, § 14; Ind. Const., Art. 4, § 8; Kan. Const., Art. 2, § 22; Ky. Const., § 43; La. Const., Art. III, § 13; Me. Const., Art. IV, Pt. Third, § 8; Md. D. R. 10, Const., Art. III, § 18; Mass. Const., Pt. First, Art. 21; Mich. Const., Art. V, § 8; Minn. Const., Art. IV, § 8; Mo. Const., Art. III, § 19; Mont. Const., Art. V, § 15; Neb. Const., Art. III, § 26; N. H. Const.,

Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity? Let us assume, merely for the moment, that Congress has constitutional power to limit the freedom of State legislators acting within their traditional sphere. That would be a big assumption. But we would have to make an even rasher assumption to find that Congress thought it had exercised the power. These are difficulties we cannot hurdle. The limits of §§ 1 and 2 of the 1871 statute—now §§ 43 and 47 (3) of Title 8—were not spelled out in debate. We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us.

We come then to the question whether from the pleadings it appears that the defendants were acting in the sphere of legitimate legislative activity. Legislatures may not of course acquire power by an unwarranted extension of privilege. The House of Commons' claim of power to

---

Pt. First, Art. 30th; N. J. Const., Art. IV, § *IV*, par. 8; N. M. Const., Art. IV, § 13; N. Y. Const., Art. III, § 11; N. D. Const., Art. II, § 42; Ohio Const., Art. II, § 12; Okla. Const., Art. V, § 22; Ore. Const., Art. IV, § 9; Pa. Const., Art. II, § 15; R. I. Const., Art. IV, § 5; S. D. Const., Art. III, § 11; Tenn. Const., Art. II, § 13; Tex. Const., Art. III, § 21; Utah Const., Art. VI, § 8; Vt. Const., c. I, Art. 14th; Va. Const., Art. IV, § 48; Wash. Const., Art. II, § 17; W. Va. Const., Art. VI, § 17; Wis. Const., Art. IV, § 16; Wyo. Const., Art. 3, § 16.

Compare Iowa Const., Art. III, § 10; N. C. Const., Art. II, § 17 (right of legislator to protest action of legislature). See also, Cal. Const., Art. IV, § 11; Iowa Const., Art. III, § 11; Miss. Const., Art. 4, § 48; Nev. Const., Art. IV, § 11; S. C. Const., Art. III, § 14 (freedom from arrest). Only the Florida Constitution has no provision concerning legislative privilege.

establish the limits of its privilege has been little more than a pretense since *Ashby* v. *White,* 2 Ld. Raym. 938, 3 *id.* 320. This Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role. *Kilbourn* v. *Thompson,* 103 U. S. 168; *Marshall* v. *Gordon,* 243 U. S. 521; compare *McGrain* v. *Daugherty,* 273 U. S. 135, 176.

The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in *Fletcher* v. *Peck,* 6 Cranch 87, 130, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned. See cases cited in *Arizona* v. *California,* 283 U. S. 423, 455.

Investigations, whether by standing or special committees, are an established part of representative government.[6] Legislative committees have been charged with

---

[6] See Wilson, Congressional Government (1885), 303: "It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function."

losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.[7] Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. The present case does not present such a situation. Brandhove indicated that evidence previously given by him to the committee was false, and he raised serious charges concerning the work of a committee investigating a problem within legislative concern. The Committee was entitled to assert a right to call the plaintiff before it and examine him.

It should be noted that this is a case in which the defendants are members of a legislature. Legislative privilege in such a case deserves greater respect than where an official acting on behalf of the legislature is sued or the legislature seeks the affirmative aid of the courts to assert a privilege. In *Kilbourn* v. *Thompson, supra,* this Court allowed a judgment against the Sergeant-at-Arms, but found that one could not be entered against the defendant members of the House.

We have only considered the scope of the privilege as applied to the facts of the present case. As Mr. Justice Miller said in the *Kilbourn* case: "It is not necessary to decide here that there may not be things done, in the one House or the other, of an extraordinary character, for

---

[7] See Dilliard, Congressional Investigations: The Role of the Press, 18 U. of Chi. L. Rev. 585.

which the members who take part in the act may be held legally responsible." 103 U. S. at 204. We conclude only that here the individual defendants and the legislative committee were acting in a field where legislators traditionally have power to act, and that the statute of 1871 does not create civil liability for such conduct.

The judgment of the Court of Appeals is reversed and that of the District Court affirmed.

*Reversed.*

Mr. Justice Black, concurring.

The Court holds that the Civil Rights statutes [1] were not intended to make legislators personally liable for damages to a witness injured by a committee exercising legislative power. This result is reached by reference to the long-standing and wise tradition that legislators are immune from legal responsibility for their intra-legislative statements and activities. The Court's opinion also points out that *Kilbourn* v. *Thompson,* 103 U. S. 168, held legislative immunity to have some limits. And today's decision indicates that there is a point at which a legislator's conduct so far exceeds the bounds of legislative power that he may be held personally liable in a suit brought under the Civil Rights Act. I substantially agree with the Court's reasoning and its conclusion. But since this is a difficult case for me, I think it important to emphasize what we do *not* decide.

It is not held that the validity of legislative action is coextensive with the personal immunity of the legislators. That is to say, the holding that the chairman and the other members of his Committee cannot be sued in this case is not a holding that their alleged persecution of Brandhove is legal conduct. Indeed, as I understand the decision, there is still much room for challenge to the

[1] 8 U. S. C. §§ 43, 47 (3).

Committee action. Thus, for example, in any proceeding instituted by the Tenney Committee to fine or imprison Brandhove on perjury, contempt or other charges, he would certainly be able to defend himself on the ground that the resolution creating the Committee or the Committee's actions under it were unconstitutional and void.

In this connection it is not out of place to observe that the resolution creating the Committee is so broadly drawn that grave doubts are raised as to whether the Committee could constitutionally exercise all the powers purportedly bestowed on it.[2] In part, the resolution directs the Committee

"to ascertain . . . all facts relating to the activities of persons and groups known or suspected to be dominated or controlled by a foreign power, and who owe allegiance thereto because of religious, racial, political, ideological, philosophical, or other ties, including but not limited to the influence upon all such persons and groups of education, economic circumstances, social positions, fraternal and casual associations, living standards, race, religion, political, ancestry and the activities of paid provocation . . . ." Cal. Senate Resolution 75, June 20, 1947.

Of course the Court does not in any way sanction a legislative inquisition of the type apparently authorized by this resolution.

Unfortunately, it is true that legislative assemblies, born to defend the liberty of the people, have at times violated their sacred trusts and become the instruments of oppression. Many specific instances could be cited but perhaps the most recent spectacular illustration is the use of a committee of the Argentine Congress as the

---

[2] See Judge Edgerton dissenting in *Barsky* v. *United States*, 83 U. S. App. D. C. 127, 138, 167 F. 2d 241, 252; Judge Charles E. Clark dissenting in *United States* v. *Josephson*, 165 F. 2d 82, 93.

instrument to strangle the independent newspaper *La Prensa* because of the views it espoused.[3]   In light of this Argentine experience, it does not seem inappropriate to point out that the right of every person in this country to have his say, however unorthodox or unpopular he or his opinions may be, is guaranteed by the same constitutional amendment that protects the free press.   Those who cherish freedom of the press here would do well to remember that this freedom cannot long survive the legislative snuffing out of freedom to believe and freedom to speak.

Mr. Justice Douglas, dissenting.

I agree with the opinion of the Court as a statement of general principles governing the liability of legislative committees and members of the legislatures.   But I do

---

[3] N. Y. Times, Mar. 16, 1951, p. 1, col. 2; N. Y. Times, Mar. 17, 1951, p. 1, col. 2.   The situation was graphically described in an editorial appearing in *La Nacion* of Buenos Aires on March 18, 1951: "But no one could have imagined until this moment that Congress, properly invested with implicit powers of investigation, could decree interventions of this nature intended to carry out acts which, under no circumstance, come within the province of the Legislature.   In the present case this alteration of functions is of unusual importance because it affects an inviolable constitutional principle.   If Congress cannot dictate 'laws restrictive of the freedom of the press' [Art. 23, Argentine Constitution], which would be the only possible step within its specific function, how could it take possession of newspapers, hinder their activity and decide their fate, all these being acts whereby the exercise of that same freedom is rendered impracticable?   If such a state of things is permitted and becomes generalized, then it means that the repetition of these acts whenever it is deemed suitable in view of conflicting opinions, would cause the constitutional guarantee to be utterly disregarded. . . .   Last year the activities of an investigating congressional commission [The Committee on Anti-Argentine Activities], appointed for another concrete purpose, served to bring about the closure of up to 49 newspapers in one day. . . ." See generally, Editor & Publisher, Mar. 24, 1951, p. 5.

not agree that all abuses of legislative committees are solely for the legislative body to police.

We are dealing here with a right protected by the Constitution—the right of free speech. The charge seems strained and difficult to sustain; but it is that a legislative committee brought the weight of its authority down on respondent for exercising his right of free speech. Reprisal for speaking is as much an abridgment as a prior restraint. If a committee departs so far from its domain to deprive a citizen of a right protected by the Constitution, I can think of no reason why it should be immune. Yet that is the extent of the liability sought to be imposed on petitioners under 8 U. S. C. § 43.[1]

It is speech and debate in the legislative department which our constitutional scheme makes privileged. Included, of course, are the actions of legislative committees that are authorized to conduct hearings or make investigations so as to lay the foundation for legislative action. But we are apparently holding today that the actions of those committees have no limits in the eyes of the law. May they depart with impunity from their legislative functions, sit as kangaroo courts, and try men for their loyalty and their political beliefs? May they substitute trial before committees for trial before juries? May they sit as a board of censors over industry, prepare their blacklists of citizens, and issue pronouncements as devastating as any bill of attainder?

No other public official has complete immunity for his actions. Even a policeman who exacts a confession by

---

[1] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

force and violence can be held criminally liable under the Civil Rights Act, as we ruled only the other day in *Williams* v. *United States,* 341 U. S. 97. Yet now we hold that no matter the extremes to which a legislative committee may go it is not answerable to an injured party under the civil rights legislation. That result is the necessary consequence of our ruling since the test of the statute, so far as material here, is whether a constitutional right has been impaired, not whether the domain of the committee was traditional. It is one thing to give great leeway to the legislative right of speech, debate, and investigation. But when a committee perverts its power, brings down on an individual the whole weight of government for an illegal or corrupt purpose, the reason for the immunity ends. It was indeed the purpose of this civil rights legislation to secure federal rights against invasion by officers and agents of the states. I see no reason why any officer of government should be higher than the Constitution from which all rights and privileges of an office obtain.