**UNITED STATES of America ex rel. Harold PETERS, Complainant,**

v.

**President Judge Roy I. CARSON and John M. Good, Clerk of Courts, Washington County, Pennsylvania, Defendants.**

Civ. A. No. 12718.

United States District Court
W. D. Pennsylvania.

Dec. 7, 1954.

No appearance for complainant.

Adolph L. Zeman, Canonsburg, Pa., Elliott W. Finkel, Pittsburgh, Pa., for defendants.

GOURLEY, Chief Judge.

In this proceeding a person sentenced by a State Judge, after conviction in trial by jury of a criminal offense, brings action for damages against the Judge and the Clerk of the criminal branch of said court.

Jurisdiction is grounded in this court upon the Civil Rights Statutes, as amended, 42 U.S.C.A. §§ 1983, 1985, 1986.

The action is premised on the failure of the sentencing judge to hear and determine a habeas corpus proceeding which had been sent via mail by the confined inmate plaintiff to the Clerk of the criminal court.

Roy I. Carson is President Judge of the Court of Common Pleas of Washington County, Pennsylvania, and President Judge of the Court of Oyer and Terminer and Court of Quarter Sessions of Washington County, Pennsylvania. 17 Pa.P.S. § 334.

John M. Good, an elective office holder, is Clerk of the Court of Oyer and Terminer and Court of Quarter Sessions of Washington County, Pennsylvania. He is not clerk of the Court of Common Pleas of Washington County, Pennsylvania, and has no authority or connection with the Clerk of the civil branch of said court, who is known in Pennsylvania as the Prothonotary which is also an elective office. 17 Pa.P.S. § 1451.

The matter comes before the court on defendants' motion to dismiss the action on the basis that the complaint states no cause of action upon which relief can be granted.

Plaintiff, who is confined by state authorities as a parole violator, alleges that on July 29, 1954 he mailed a Petition for Writ of Habeas Corpus to John M. Good, Clerk of Courts, Washington County, Pennsylvania, with a check in the sum of $5.50 to cover filing fees;

that no reply was received either from the Clerk or President Judge of the Court of Common Pleas; that no hearing date was fixed, and the matter not adjudicated.

██ Judicial knowledge will be taken of the records of said court and the official positions of the respondents. Said records have been made part of the record in this proceeding, and identified as court exhibits.

Plaintiff filed no proceeding with the Supreme Court of Pennsylvania in the nature of a mandamus to compel the state court to proceed in the disposition of his petition.

The authority for plaintiff to secure relief in the highest tribunal of the Commonwealth of Pennsylvania as a court of original jurisdiction is well recognized and clearly chartered both by statute and legal construction.

Article V, Section 3 of the Constitution of Pennsylvania, P.S. confers upon the Supreme Court of Pennsylvania original jurisdiction of mandamus to courts of inferior jurisdiction within the state. Under the Act of June 8, 1893, P.L. 345, 12 P.S. § 1911 et seq., it is specifically provided that a writ of mandamus may be used to procure the enforcement of a public duty or to compel a judge of inferior jurisdiction to perform his duties. Commonwealth ex rel. Duff v. Keenan, 347 Pa. 574, 33 A.2d 244.

The judges of the Supreme Court have full power and authority when, and as often as there may be occasion, to issue all remedial writs and processes. 17 Pa. P.S. § 48.

It is well to observe that the instant plaintiff had filed a petition of habeas corpus on December 27, 1951 with the Prothonotary of the Common Pleas Court of Washington County. The proceeding appears to have been abortively terminated without any final disposition.

On March 30, 1954, plaintiff filed a petition for writ of habeas corpus with the Prothonotary of Washington County. Upon the date fixed for hearing, April 12, 1954, no persons appeared, and upon consideration of the papers filed, Judge Carson filed an opinion and order dismissing the said petition.

In spite of the previous history of having filed two petitions for writs of habeas corpus with the office of Prothonotary of Washington County, the plaintiff asserts that he mailed the petition, upon which he now premises his suit for damages, to the office of the Clerk of Courts.

It is further most interesting to note that subsequent to the date that plaintiff alleges that he filed his petition with the Clerk of Courts, he again filed a petition for writ of habeas corpus with the Prothonotary on October 15, 1954, which was dismissed by opinion and order of Judge Carson on November 8, 1954.

In none of the cases in which plaintiff petitioned for writ of habeas corpus which had been filed with the Prothonotary of Washington County did plaintiff exhaust his state remedies by perfecting an appeal to the State Supreme Court of Pennsylvania and petition for certiorari to the Supreme Court of the United States. Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761.

It has been the observation of the court in the last several months that many state prisoners have drawn away from exhausting state remedies where petitions for writs of habeas corpus are denied by lower state courts. In lieu thereof, actions of the nature involved in this proceeding are instituted against the sentencing judges, their clerks, arresting officers, or some person involved in the apprehension, arrest, prosecution, conviction and confinement of the state law offender.

An exemplified copy of the records discloses that plaintiff, upon jury trial, was convicted of burglary and sentenced February 24, 1951, at No. 23 February Term 1950 in the Court of Oyer and Terminer of Washington County, Pennsylvania, for a term of not less than one year or not more than five years, to be computed from November 18, 1949. He was released from said confinement by the Pennsylvania Board of Parole on

December 27, 1951. During the period of his parole, he was convicted of another crime in the State of Michigan, and upon his release from prison in that state, he was brought to the Western Correctional Diagnostic and Classification Center as a parole violator. As a parole violator, he may have forfeited the benefit of his parole and the balance of his time, two years, ten months and twenty-one days, may be added to his period of incarceration. This will be a matter of future determination on the part of the state authorities.

No useful purpose could be gained by having plaintiff present, he being confined to the custody of the state authorities, since the issues posed evolve entirely on a question of law, all factual issues having been resolved in favor of plaintiff.

 In considering a motion to dismiss, the complaint must be viewed in a light most favorable to the plaintiff, and should not be dismissed unless it appears to a certainty that plaintiff would not be entitled to relief under any state of facts which could be proved in support of the plaintiff's claim, and no matter how likely it may seem that the plaintiff would be unable to prove its case, it is entitled upon averring a claim to an opportunity to prove it. The truth of all facts well pleaded is admitted, including facts alleged on information and belief. Frederick Hart & Co., Inc., v. Recordgraph Corp., 3 Cir., 169 F.2d 580.

For purpose of disposition of this motion, resolving as we must all factual issues in favor of the plaintiff, we must assume that plaintiff had properly filed a petition for writ of habeas corpus with the Clerk of the Washington County Courts; that the Clerk had received the filing fees in connection therewith, and that the President Judge of said court failed to act on the petition, and that such failure to act was violative of defendant's civil and constitutional rights.

I shall first discuss the motion as it relates to Roy I. Carson, President Judge of the Court of Common Pleas of Washington County, Pennsylvania, and President Judge of the Court of Oyer and Terminer and Court of Quarter Sessions of Washington County, Pennsylvania.

## Rule of Law Prior to Civil Rights Statutes

The principle, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and had never been denied in the courts of this country prior to the adoption of the Civil Rights Statutes in the United States.

It was considered essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. Said firmly embedded rule of law was considered not for the protection or benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences. It was reasoned that a judge could not exercise his office if he were in daily and hourly fear of an action being brought against him, and of having the question submitted to a jury whether a matter on which he had commented judicially was or was not relevant to the case before him.

A defeated party to litigation may not only think himself wronged, but may attribute wrong motives to the judge whom he holds responsible for his defeat. He may think that the judge has allowed passion or prejudice to control his decision. To allow a judge to be sued in a civil action on a complaint charging the judge's acts were the result of partiality, or malice, or corruption, would deprive the judges of the protection which is regarded as essential to judicial independence. It was not in the public interests that such a suit should be maintained; and it was a fundamental

principle of English and American jurisprudence that such an action could not be maintained. Yaselli v. Goff, 2 Cir., 12 F.2d 396, 399, 56 A.L.R. 239.

Prior to the Civil Rights Statutes, in our system of jurisprudence it, therefore, appeared a time-honored immunity of judges existed from civil liability for their official or judicial acts, no matter how erroneous, malicious or corrupt they may have been. Bradley v. Fisher, 13 Wall. 335, 349, 80 U.S. 335, 349, 20 L.Ed. 646; Papagianakis v. The Samos, 4 Cir., 186 F.2d 257; Tinkoff v. Holly, 7 Cir., 209 F.2d 527.

### Civil Rights Statutes and Their Effect Upon the Judiciary

The question now posed before this court is whether or not such immunity continues in effect after the enactment of the Civil Rights Statutes.

As an aftermath of Civil War and national convulsion, the Civil Rights Statutes were forged by the great statesmen and lawyers of both Houses of Congress. It must be considered whether these stalwart defenders of constitutional government intended to employ the Civil Rights Statutes as a bludgeon to strike asunder the fundamental and basic concept of judicial independence—which by and large feeds life blood to the arteries of the organism of free government.

The apparently sweeping and unqualified language of the old Civil Rights Act, 8 U.S.C.A. § 43 and more recently changed to 42 U.S.C.A. §§ 1983, 1985, 1986, as amended, seems to say that every person in official position, whether executive, legislative, or judicial, who under color of state law subjects or causes to be subjected any person to the deprivation of any rights secured by the Constitution of the United States, shall be liable in damages to the person injured. The enactment in terms contains no recognition of possible defenses or exemptions, by way of privilege, even where the defendants may have acted in good faith, in compliance with what they believed to be their official duty. Reading the language of the Act in its broadest sweep, it would seem to make no difference that the conduct of the defendants might not have been tortious at common law; for the Act, if read literally, creates a new federal tort, where all that has to be proved is that the offender as a result of his conduct under color of state law has in fact caused harm to the plaintiff by depriving him of rights secured by the Constitution of the United States and the Civil Rights Statutes.

Fortunately Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019, has relieved us of the necessity of giving the Civil Rights Act such an awesome and unqualified interpretation. That case held that the broadly expressed terms of the Civil Rights Act could not have been intended to deprive state legislators of their preexisting and well-established complete immunity from civil liability for official acts done within the sphere of legislative activity. Francis v. Crafts, 1 Cir., 203 F.2d 809, 811; Cobb v. City of Malden, 1 Cir., 202 F.2d 701.

I have given most thorough consideration to the conclusions enunciated in Picking v. Pennsylvania R. Co., 3 Cir., 151 F.2d 240, relative to the application of Civil Rights provisions as they apply to the civil liability of judges of general jurisdiction. I must concur with plaintiff to the extent of admitting that its language appears to bestow sweeping and unqualified effect to the Civil Rights Acts.

Nevertheless, I am cognizant that the judicial officer involved in this circuit's decision was a justice of the peace, not a judge of a court of general jurisdiction, as in the case at bar. More important, the Picking case was decided in 1945, without benefit of the illumination and compelling analogy to be found in the Supreme Court in Tenney v. Brandhove, supra. See Francis v. Crafts, supra.

In construing the language of the old Civil Rights Act, 8 U.S.C.A. § 43, which more recently has been re-enacted into the sections under which the instant

proceeding was brought, the Supreme Court held that the Civil Rights Statutes were not intended to make legislators personally liable for damages to a witness injured by a committee exercising legislative power.

Crucial to the issue raised is this most compelling language of the Supreme Court:

"Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity? Let us assume, merely for the moment, that Congress has constitutional power to limit the freedom of State legislators acting within their traditional sphere. That would be a big assumption. * * * We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." Tenney v. Brandhove, supra [341 U.S. 367, 71 S.Ct. 788].

It would appear incongruous and contradictory to the doctrine of judicial independence, to hold that judicial officers of a state stand in a less favorable position than do state legislators, in respect to immunity from civil liability for acts done in their official capacity.

I have no doubt that the Third Circuit would no longer feel obliged, as it did in the Picking case, to read the Civil Rights Act in such literal and unqualified manner as to impose a liability for damages upon a state judicial officer for acts done in the exercise of his judicial function.

It is axiomatic that the same immunity which applies to state legislators in the performance of their legislative duties would have application to the official acts of judges. Francis v. Crafts, supra; Cobb v. City of Malden, supra.

If plaintiff's thesis requiring the imposition of civil liability upon judges in the performance of their civil duties were to be given effect, utter chaos would pervade the judicial system. Judges would render decisions under the constant fear of civil suits, and the administration of justice would cause judges to temper their decisions with the sole view of avoiding disgruntled litigants. Judges would require the constant service of members of the bar in defending their actions, and would always face the peril of showing favoritism toward those attorneys whose services they have been required to invoke. This necessity would again tend to convince an unsuccessful litigant that rights under the Civil Rights Statutes have been denied. In such cases where judges should disqualify themselves as when counsel had previously served in their behalf, circumstances would prove untenable in those numerous judicial districts where the complement of the court consists of a single judge. Indeed, judges not only would be confronted with the stark realism of having their savings and holdings frittered away in defending themselves against a multiplicity of frivolous and unfounded civil suits, but would also suffer the embarrassment and degradation of defending themselves against the sniping and collateral attacks of dissatisfied litigants. It would create an endless chain and vicious circle to which no solution or correction could ever be attained.

The independence of the judiciary would be of little value if judges could be subjected to the cost and inconvenience and distractions of a trial upon the conclusion of a case, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

In times of political passion, vindictive motives are readily attributed to judicial conduct and is readily believed. Courts are not the place for such con-

troversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.

I do not believe any basis exists under the Civil Rights Statutes or any other law in which this court would have jurisdiction to sustain the cause of action against Roy I. Carson, President Judge of the Court of Common Pleas of Washington County, Pennsylvania, and President Judge of the Court of Oyer and Terminer and Court of Quarter Sessions of Washington County, Pennsylvania.

In connection with the motion as it relates to John M. Good, Clerk of the Court of Quarter Sessions and Court of Oyer and Terminer of Washington County, Pennsylvania, counsel for defendant stated during argument that the plaintiff's petition, if it were sent, had been apparently received by the Clerk, instead of the Prothonotary, and that the same had been apparently mislaid. We shall assume that it had been sent to the Clerk and that it had not been filed or heard.

This Court will take judicial notice of the statutes of Pennsylvania which recognize that the Office of the Clerk of Courts does not relate to the business of the Court of Common Pleas, which is the Court that has jurisdiction in habeas corpus proceedings. The Clerk of Courts is a Clerk of the Criminal Courts in Washington County, Pennsylvania. 17 Pa.P.S. § 1451. Habeas corpus is a civil remedy rather than a criminal proceeding and jurisdiction for the consideration of a petition for a writ of habeas corpus is in the Court of Common Pleas and the filing of such a pleading would be with the Prothonotary of that court. No jurisdiction exists in either the Court of Quarter Sessions or Court of Oyer and Terminer, 12 Pa.P.S. § 1871; 12 Pa.P.S. Section 1901; Com. ex rel. Paylor v. Claudy, 366 Pa. 282, 77 A.2d 350.

Since the complaint alleges that a petition for writ of habeas corpus was filed with the defendant John M. Good, Clerk of Courts, there could be no legal basis for the cause of action against him for his failure to file the same in his office when his office has no jurisdiction over such a pleading. Said Clerk could not be charged with breach of any duty he did not have and could not be held accountable in a trespass action for failure to perform a duty which he never had. Thus, the complaint utterly fails to state a cause of action against the defendant John M. Good, and should be likewise dismissed as to him.

For the reasons stated, I must, therefore, conclude that the instant complaint fails to state a cause of action upon which relief can be granted, and that the same should be dismissed.