**Robert M. PAGANO, Plaintiff,**

v.

**Samuel A. MARTIN and Howard Earl Miniter, Jr., Defendants.**

**Civ. A. No. 6203.**

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 6, 1967.

---

Robert M. Harcourt, Norfolk, Va., for plaintiff.

Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., for defendant.

### MEMORANDUM ORDER

KELLAM, District Judge.

Plaintiff here seeks damages from the defendants for alleged published malicious libelous writings. Defendants claim privilege.

### THE FACTS

Plaintiff and defendants are members of the United States Navy and attached to the USS ROBERT A. OWENS (DD 827). Pagano is a radarman with the rank of E–6, a First Class Petty Officer, and is O1 division leading petty officer. Martin holds the rank of Commander and was Commanding Officer of said ship. Miniter, who holds the rank of Lieutenant Commander was its Executive Officer. Pagano had practiced his profession of radarman in the Navy for 9½ years. He has an excellent reputation in his profession, attained by his conduct, industry and ability. He had planned to make the Navy a career.

On December 16, 1966, Pagano was rated by the Executive Officer, Miniter, for the semi-annual period. It was a good rating. The report said:

"Pagano has shown himself to be a competent radarman and an excellent petty officer by his extremely effective and reliable professional performance. He expresses himself well and with authority."

Among other things, the report said of Pagano that he "promotes good morale", "gets the most out of his men", "works well on his own", "willingly follows commands and regulations".

On or about December 16, 1966, Pagano went on ten days annual leave, to return January 7, 1967. He requested and received ten days emergency leave from January 9, to January 20, 1967, because his wife was "being operated on". On January 17, 1967, a Naval Message was sent from Naval Station at Norfolk to the USS ROBERT A. OWENS, advising that Pagano's wife was still in the hospital and requesting ten days extension of the emergency leave. The message set out that orders were aboard the ship for his transfer in March as a school instructor to San Diego. The message suggested that Pagano not be returned to the ship, but assigned to the Naval Station at Norfolk to save the cost of transportation. After some controversy this was done. Hence, it appears that after December 16, 1966, Pagano was only attached to the USS ROBERT A. OWENS for ten days (December 16, 1966 to December 27, 1966), nor was he under the observation of either of the defendants after that time.

On February 2, 1967, a rating report was filed by Miniter covering the period December 17, 1966, to February 2, 1967, together with certain recommendations. This report and recommendations are the basis of this action. The report said that Pagano "quite often failed to demonstrate the qualities of leadership expected of a first class petty officer * *

he aired his complaints about this commands policies in front of his subordinates whenever he felt he had been treated unfairly * * * too often he diverted his efforts toward getting his own way * * * he broke the chain of command to register a complaint * * * he raised undue objections to orders given him * * * his professional performance attitude and capabilities were extremely marginal and in general of the E–4 level. His attitude was in general bad for morale. He is not recommended for reenlistment in the future." On December 9, 1966, Miniter, by direction of Martin, had stated in the record of Pagano:

> "Recommended for advancement and nominated for examination. Eligible in all respects for participation in Navy-wide competitive examination for R D C."

On February 2, 1967, this recommendation was withdrawn. He was assigned a low mark in Leadership and Supervisory Ability, and in Adaptability.

Pagano says his Navy career is now at an end; that the performance report filed by defendants on February 2nd was false and malicious, and with intent to damage and injure plaintiff; that defendants were not required or even authorized to file this report; that there was no basis for the report; that on December 16, 1966, defendants had given plaintiff a good report, and had only six days thereafter to observe him in the performance of his duties; that defendants became angry and displeased when plaintiff requested an extension of his emergency leave, which had the effect of relieving him from duty aboard their ship.

Plaintiff says the alleged malicious report was beyond the duty and power vested in defendants by the Rules and Regulations governing the rating and report on personnel under their command; he says that pursuant to the Bureau of Naval Personnel Manual C–7281, these defendants were not authorized to make such a report because 90 days had not elapsed since the previous report. Defendants' immediate superior officer says that the Navy Manual does not prohibit a report being made more frequently than each six months, and that the report was made in the normal course of the official duties of the defendants, as was customary on that ship.

A copy of the provisions of Chapter 7 (C–7821) of Bureau of Naval Personnel Manual, Revised 1959, is attached to the papers in this cause, and made a part of this opinion. It will be noted from this Manual that it prescribes that reports shall be made at specified periods, and that under paragraph (8)(b)4, that a "Special evaluation may also be made at any time when the individual's performance indicates that special cognizance should be taken of an outstanding occurrence, either meritorious or derogatory." In any event, there is nothing in the Manual which prohibits an officer from making other reports.

Defendants filed a motion to dismiss for alleged failure to state a cause of action because defendants were acting within the scope of their employment and the reports complained of were made in the normal course of these duties. This motion is treated as a motion for summary judgment.

■ Defendants' contention is that the making of the report in question and the ratings issued are absolute privilege. That is, that the statements were in the discharge of defendants' official duties and in relation to matters which they had the right and duty to report upon. There is no doubt defendants are Federal Officers. Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454; Denman v. White, 316 F.2d 524 (1st Cir. 1963). The authority for a Federal Officer to to act derives from federal sources and the federal courts in such cases are not bound to follow the state law. Howard v. Lyons, supra.

■ Individual officers of the United States Navy who, in the discharge of their official duties, report of and concerning persons under their command, are and should be protected by an absolute privilege from personal liability in defamation actions. The United States

Supreme Court held in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 and Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454, that individual officers of the United States Government who issued public statements in the discharge of their official duties were prohibited by an absolute privilege from personal liability in defamation actions. Among the reasons for the privilege it was said officials of government should be free to exercise their duties without fear of damage suits for acts done. It quoted from the excellent opinion of Judge Learned Hand in Gregoire v. Biddle, 2 Cir., 177 F.2d 579, wherein, among other things, he said:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave un- redressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation * * *

"The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him * * *"

The privilege is an expression of a policy designed to aid in the effective functioning of government. It is not the title to the office which is protected, but the performance of the duties entrusted to the officer.

■ The mere fact that the defendants were not required by the Navy Regulations to make the report does not destroy the privilege. They had the power and authority to make the report. This is covered in the opinion of Barr v. Matteo, 360 U.S. 564, at 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434, where the Court said:

"That petitioner was not required by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.

"The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable, despite the allegations of malice in the complaint, for as this Court has said of legislative privilege:

'The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.' Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 75 L.Ed. 1019."

In Preble v. Johnson, 275 F.2d 275 (10th Cir. 1960), the Court said that statements which are not authorized by or in furtherance of some rule or regulation may be in line of official duty, and if deemed appropriate to the exercise of utterer's office or station, are privileged. See also Brownfield v. Landon, 113 U.S. App.D.C. 248, 307 F.2d 389 (1962).

We deal with the relation between the acts complained of and the matters committed to the supervision and determination of the defendants. They are not bound by a "rigid scope of duty", but are entitled to a more liberal and generalized concept of line of duty.

There doubtless are instances of actual injustices which will go unredressed, but this must be weighed against the whole. The law is not perfect. It is the good of the great majority which must be protected. Some must suffer for the good of the masses. Although the reports in this case appear harsh, without much outward foundation, and far-reaching, it would almost destroy the system of rating inferior rank personnel by the higher rank if the person was denied the right to express his opinions freely. If there

is to be any further restriction in this field, it should be imposed by Congress. If an officer is to answer for such opinions as are expressed in this case, it should be by direction of Congress or by Rules and Regulations promulgated by authority of Congress.

The statements made were absolute privilege, and the motion for summary judgment is granted, and the Clerk is ordered to enter the same.