UNITED STATES of America, Plaintiff,

v.

**Frederick W. RICHMOND, Defendant.**

**Nos. 82–CR–416, 82–CR–417 and 82–CR–418.**

United States District Court, E.D. New York.

Nov. 10, 1982.

---

Raymond J. Dearie, U.S. Atty. by Francis Murray, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Kalman V. Gallop, New York City, for defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

Defendant, a Member of Congress, agreed to plead guilty to income tax evasion (26 U.S.C. § 7201), supplementing the salary of a federal employee (18 U.S.C. § 209) and possession of marijuana (21 U.S.C. § 844). He also undertook to immediately resign from Congress and withdraw as a candidate for re-election. The govern-ment, in return, consented not to prosecute him for a variety of other crimes.

■ For the reasons indicated below those portions of the plea agreement pertaining to resignation from Congress and withdrawal as a candidate for re-election are void. They represent an unconstitutional interference by the executive with the legislative branch of government and with the rights of the defendant's constituents.

### I

The written agreement between the prosecutor and defendant insofar as relevant states:

> We understand that today Mr. Richmond is resigning his position as a member of Congress of the United States and withdrawing as a candidate for re-election to that position. Moreover, in the event that it is no longer possible for Mr. Richmond to formally remove his name from the ballot, Mr. Richmond will announce that he is no longer seeking renomination and re-election to his seat in Congress, and will take whatever legal steps are necessary to ensure he will not serve in the event he should be renominated and re-elected.... [T]he plea of guilty, which Mr. Richmond will enter ... will result in the loss of his public office....

This portion of the agreement was invalid for three reasons. First, it conflicted with the fundamental right of the people to elect their representatives. Second, it interfered with the principle of separation of powers. Third, it contravened public policy by utilizing a technique latent with the possibility of Executive domination of members of Congress through the threat of forced resignations.

### II

#### A.

■ The maxim that the people are sovereign in a republican form of government, *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6

S.Ct. 1064, 1071, 30 L.Ed. 220 (1886), has as its natural corollary that they retain the broadest freedom to select legislative representatives. "[T]he true principle of a republic," argued Alexander Hamilton, "is that the people should choose whom they please to represent them." 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876), quoted in *Powell v. McCormack*, 395 U.S. 486, 540–41, 89 S.Ct. 1944, 1973–74, 23 L.Ed. 491 (1969).

This imperative was embodied in the Constitution by prescribing only a limited number of qualifications for congressional office. Const.Art. I, § 2, cl. 2, § 3, cl. 3 (age, length of United States citizenship, and in-state residence requirements). *See also* Const.Art. I, § 6, cl. 2 (prohibition against members of Congress holding other federal office); Amend. XIV, § 3 (disqualification from congressional office of persons who, having previously sworn to support the Constitution, subsequently engaged in insurrection, rebellion or aid to the enemy). Our government's founders deliberately withheld from Congress the authority to add or detract from the enumerated qualifications. "The qualifications of the persons who may choose or be chosen, as has been remarked on other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature." The Federalist No. 60 (A. Hamilton). *See also* No. 52 (J. Madison).

The courts have not permitted attenuation of this fundamental principle. For example, in *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), Congress attempted to indirectly impose additional qualifications by refusing to seat a congressman alleged to have misused congressional funds. Marshalling the constitutional text and ample historical material from both the pre- and post-ratification periods, the Supreme Court held that the exclusion was constitutionally impermissible. Since Congressman Powell had met the textually explicit criteria for membership and was duly elected by his constituents, even the House of Representatives was without power to exclude him. "The fundamental principle involved [in *Powell*

was] the right of the people to elect whom they choose to elect for office." *Stack v. Adams*, 315 F.Supp. 1295, 1298 (N.D.Fla. 1970). It was the people of the Congressman's district who were to decide upon his moral and other qualifications, not Congress. A fortiori this inhibition applies to other branches of government.

The Constitution does empower the houses of Congress to discipline their members and in extreme cases to expel them by a two-thirds vote. This does not, however, materially restrict the freedom of the people to be represented by their chosen legislators. The reluctance of a political body to impose harsh sanctions on its members coupled with the requirement of a supermajority makes expulsion a most extraordinary remedy. It has rarely been invoked. *See,* Note, 82 Colum.L.Rev. 998, 1003–04 (1982). Even Congressman Powell would probably not have lost his seat had the vote to oust him been considered an expulsion. *Powell v. McCormack*, 395 U.S. at 506–12, 89 S.Ct. at 1956–59. In any event the power of the people to select is quite independent of the power of Congress to expel. Here the prosecutor attempted to subvert both the authority of Congress and that of the people.

It is significant that even the states are barred from imposing additional qualifications on congressional candidates. In a case of particular relevance, *Application of Ferguson*, 57 Misc.2d 1041, 294 N.Y.S.2d 174 (S.Ct.), *aff'd*, 30 A.D.2d 982, 294 N.Y.S.2d 989 (1968), the Secretary of the State of New York had construed state law to deny a convicted felon certification as a candidate for the United States Senate. The court properly held that state law could not render a felon ineligible from seeking federal legislative office.

In an earlier New York case, *In re O'Connor*, 173 Misc. 419, 17 N.Y.S.2d 758 (S.Ct. 1940), the court was asked to block the nomination of a federal convict and avowed communist for the House of Representatives. Denying the application, the court stressed the exclusivity of the constitutional qualifications. *See also, Danielson v. Fitz-*

*simmons,* 232 Minn. 149, 44 N.W.2d 484 (1950) (state cannot bar the congressional candidacy of person convicted of conspiracy to overthrow the United States government); *Dillon v. Fiorina,* 340 F.Supp. 729 (D.N.M.1972) (striking down requirement that candidate in a primary for congressional office must have resided in the state for one year and have been a party member for an additional year prior to the election); *Stack v. Adams,* 315 F.Supp. 1295 (N.D.Fla. 1970) (invalidating law preventing state officials from simultaneously running for federal office); *Hellmann v. Collier,* 217 Md. 93, 141 A.2d 908 (1958) (invalidating requirement that a congressional representative must reside in the district from which he is elected); *State ex rel. Johnson v. Crane,* 65 Wyo. 189, 197 P.2d 864 (1948) (striking down prohibition against governor seeking the office of United States Senator). *But cf. Signorelli v. Evans,* 637 F.2d 853 (2d Cir.1980) (permissible for state to require state judges to resign before running for federal office).

■ Just as Congress and the states are prohibited from interfering with the choice of the people for congressional office, federal prosecutors may not, directly or indirectly, subvert the people's choice or deny them the opportunity to vote for any candidate.

### B

Of the separation of powers under our political system Madison declared: "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty." The Federalist No. 47. The essential role of the division of federal authority in the preservation of our liberty has been repeatedly stressed by the Supreme Court. *See, e.g., United States v. Brown,* 381 U.S. 437, 442–43, 85 S.Ct. 1707, 1711–12, 14 L.Ed.2d 484 (1965); *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

In order to effect a workable separation of powers scheme, Madison deemed it essential "that each department should have a will of its own; and consequently should be so constituted that the members of each should have as little agency as possible in the appointment of the members of the others." The Federalist No. 51. While this principle was compromised with regard to members of the judiciary—being balanced by protections of appointment for life and against diminution of compensation—it was strictly observed in the constitutional formula for selection of members of Congress. Power to strip a member of Congress of elective office was committed to neither the executive nor the judiciary. It was explicitly reserved to Congress itself.

### C

The possibility of the executive utilizing the threat of prosecution to force the resignation of a congressional representative involves potentially dangerous political consequences. It represents an opportunity for an assault on the composition and integrity of a coordinate branch of government. Taken together, investigative techniques such as those used in the Abscam cases, *see United States v. Myers,* 688 F.2d 817 (2d Cir.1982), the enormous spectrum of criminal laws that can be violated, the powerful investigative and prosecutorial machine available to the executive, and forced resignations through plea bargaining would provide an intolerable threat to a free and independent Congress.

Even where federal prosecutors properly adhere to their role, a member of Congress found guilty of criminal conduct may be expelled, *see* 126 Cong.Rec. H10289–309 (daily ed. Oct. 2, 1980) (expulsion of Congressman Myers). Alternatively he may resign to avoid expulsion, *see* 128 Cong.Rec. S1454–69 (daily ed. March 3, 1982), S1999 (daily ed. March 11, 1982) (resignation of Senator Williams) or the embarrassment of serving under the cloud of conviction. Such decisions, however, are for Congress or the Congressman, not the executive. *Cf. United States v. Diggs,* 613 F.2d 988 (D.C.Cir. 1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980); 126 Cong.Rec. H4407 (daily ed. June 3, 1980); N.Y. Times, June 4, 1980, at A16.

It is true that the executive and its law enforcement personnel may use a private hint of prosecution in an attempt to manipulate subservient members of Congress or drive out of office congressional critics. Since this power exists in fact it may be argued that there is little to be gained by preventing open and explicit plea agreements to force resignations. The answer is twofold. First, the courts cannot acquiesce in or place their imprimatur on an impropriety. Second, it cannot be assumed that future prosecutors will flout the law once such conduct has been declared illegal by the courts.

It matters not that in this case the prosecutor's intention was benign. Availability of the technique and the possibilities of its abuse cannot be tolerated. "The accretion of dangerous power does not come in a day. It does come, however, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 593–94, 72 S.Ct. 863, 888–89, 96 L.Ed. 1153 (Frankfurter, J., concurring). The prosecutorial practice of dealing in legislative office in negotiations with congressional defendants must be arrested before its potential for abuse is realized.

### III

■ The defendant's voluntary consent cannot cure those portions of the plea bargain condemned by the Constitution. Even arms length negotiated commercial contracts between persons of equal power are void if they offend public policy. *See* Restatement (Second) of Contracts §§ 178, 179 (1980).

■ The constitutional protections of legislators and candidates exist not for their personal benefit but to safeguard the rights of the people. *United States v. Brewster*, 408 U.S. 501, 507, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972); *Tenney v. Brandhove*, 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed.2d 1019 (1951); *Bullock v. Carter*, 405 U.S. 134, 143–44, 92 S.Ct. 849, 855–856, 31 L.Ed.2d 92 (1972). A member of Congress may not barter away constitutional protections which belong not to him but to his constituents.

### IV

■ The sentencing court is obliged to carefully consider all the terms of a plea to ensure that they are lawful. Rule 11(e)(3) of the Federal Rules of Criminal Procedure provides that if a court accepts a plea agreement it must inform the defendant "that it will embody in the judgment and sentence the disposition provided for in the plea agreement." The court thus becomes a party to the plea arrangement when it issues a judgment of sentence. By incorporating a provision in its decree, the court places upon it the approval of the judicial office. For the reasons already stated a court no more than the executive has power to involve itself in the removal of congressional officers nor can it foreclose the candidacy of contenders for future office.

Only one case has been found suggesting a contrary result, *United States v. Tonry*, 605 F.2d 144 (5th Cir.1979). Tonry was a United States Representative who pleaded guilty to several violations of federal election law. As a condition of probation the trial court enjoined the defendant from running for office or engaging in political activity, both federal and state. On appeal the defendant unsuccessfully challenged the probation condition as it pertained to state office, although he did not question the district court's power to forbid him from running for federal office. 605 F.2d at 146 n. 2, 147. Insofar as the opinion might be construed to sanction a judicial limitation on the right of a defendant to run for Congress, it cannot be followed.

In a case somewhat comparable to *Tonry*, the Second Circuit invalidated a condition of probation requiring the defendant, a lawyer, to resign from the bar. The court reasoned that established procedures existed for disbarment, and that it would be unwarranted for the federal courts to inject themselves into that arena. *United States v. Pastore*, 537 F.2d 675 (2d Cir.1976). Even greater circumspection must be ob-

served by the courts with regard to congressional office-holders and aspirants.

### V

The defendant's plea remains valid with regard to the charges to which he has pleaded and the agreement of the government not to pursue other criminal action. That aspect of the plea which required the defendant to resign from office and terminate his re-election campaign offends the Constitution, is contrary to public policy, and compromises the integrity of this court. It is therefore void and forms no part of the judgment of sentence.

So ordered.