Norman F. DACEY and Norman F. Dacey doing business as National Estate Planning Council, Plaintiff,

v.

NEW YORK COUNTY LAWYERS' AS-SOCIATION, Defendant.

No. 67 Civ. 3021.

United States District Court
S. D. New York.

Oct. 9, 1968.

As Amended Oct. 11, 1968.

**836**

Arthur Stephen Penn, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Simon H. Rifkind, Edward N. Costikyan, Robert L. Beerman, New York City, of counsel.

WYATT, District Judge.

This is a motion by defendant New York County Lawyers' Association (the Association) for an order dismissing the action because the amended complaint fails to state a claim upon which relief can be granted (Fed.R.Civ.P. 12(b) (6)).

The motion must be granted.

#### I.

Plaintiff Dacey, who is not a lawyer, is the author of a book "How to Avoid Probate!" (the Book). The nature of the Book is thus described in the amended complaint: "The Book is a strong criticism of the probate court system and lawyers engaged in trusts and estates practice and sets ways and means of avoiding both. The Book contains various forms and explanatory material dealing with decedents' estates and lifetime trusts". The Book was published in November 1965.

Defendant Association is a membership corporation organized in 1908 under the Membership Corporations Law of New York. The members of the Association are lawyers practicing in New York County; there are many such members and it is believed to be the largest local bar association in the United States.

(I am a member of the Association and have been for some years; after being so advised at the oral argument, plaintiff and his attorney stated that they did not suggest any disqualification.)

A membership corporation in New York is by definition "a corporation not organized for pecuniary profit" (Membership Corporations Law, McKinney's Consol.Laws, c. 35, § 2). That law also has the following special provision for bar associations (§ 11(7)):

> "The corporate purposes of a bar association shall be cultivating the science of jurisprudence, promoting reforms in the law, facilitating the administration of justice, elevating the standard of integrity, honor and courtesy in the legal profession, cherishing the spirit of brotherhood among the members thereof, and such kindred purposes as may be stated in the certificate. The incorporators shall be members of the bar in active practice."

The Association is thus a non-profit organization of lawyers having among others the purposes just stated.

The Judiciary Law of New York, McKinney's Consol.Laws, c. 30, gives the Supreme Court power to punish for a criminal contempt "any person who unlawfully practices or assumes to practice law" (§ 750, subd. B). The same section provides that a proceeding for such punishment may be instituted "on the court's own motion or on the motion of any officer charged with the duty of investigating or prosecuting unlawful practice of law, or by any bar association incorporated under the laws of this State".

In January 1967, the Association, acting under Judiciary Law § 750, subd. B, filed a petition instituting a summary proceeding in the Supreme Court, New York County, to adjudge in contempt and to enjoin Dacey and also the publisher of the Book and two retail booksellers.

On June 28, 1967, Mr. Justice Marks handed down an opinion finding Dacey in contempt because he was engaged through the Book in the unlawful prac-

tice of law; Mr. Justice Marks stated in his opinion that Dacey and the other respondents should be enjoined (54 Misc. 2d 564, 282 N.Y.S.2d 985 (Sup.Ct. 1967)).

Before a judgment had been entered on the opinion of Mr. Justice Marks, this action was commenced in this Court on August 7, 1967. The complaint averred that the decision of Mr. Justice Marks and the prosecution by the Association of the contempt proceeding was an illegal and unconstitutional restraint on the freedom of speech and of the press guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and by the civil rights laws (42 U.S.C. § 1981 and following). The jurisdiction of this Court was said to be based on 28 U.S.C. §§ 1331 and 1343. The relief asked was an injunction restraining the Association from further prosecuting the contempt proceeding and from enforcing any injunction granted by the State Court.

A judgment on his opinion was signed by Mr. Justice Marks and entered on September 6, 1967. Plaintiff promptly appealed to the Appellate Division, First Department. The Association agreed that, pending decision of that appeal, it would not attempt to enforce the State Court judgment.

In the case at bar, an application for a preliminary injunction was made by plaintiff to Judge McLean. On October 9, 1967, this application was denied, principally (a) because the constitutional and other claims could be, and were, raised in the State Court proceedings and (b) because, since the Association was not attempting to enforce the State Court order, there was no irreparable injury to plaintiff.

On October 24, 1967, the Appellate Division, by a vote of 4 to 1, affirmed the judgment of the New York Supreme Court as to plaintiff but modified the judgment as to the other respondents (28 A.D.2d 161, 283 N.Y.S.2d 984). The majority was made up of Justices Eager, Capozzoli, Tilzer and McNally, with ma-

jority opinion by Mr. Justice Eager. There was a dissenting opinion by Mr. Justice Stevens. The dissenting opinion emphasized that the publication of a book—even if it be a legal text—does not amount to the practice of law, that publication of legal forms is not the practice of law, that buying the Book is not an employment of plaintiff as a lawyer but rather an attempt by the purchaser to be his own lawyer, and that the relationship between an author and the purchaser of his book is not that of attorney and client.

On December 29, 1967, the Court of Appeals of New York reversed the order of the Appellate Division and dismissed the petition of the Association, on the dissenting opinion at the Appellate Division (21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459). Judge Scileppi dissented and voted to affirm on the prevailing opinion at the Appellate Division.

An amended complaint was then on January 22, 1968 filed in this Court in the case at bar.

The amended complaint no longer sought any injunction against the State Court proceeding because that had terminated favorably to plaintiff.

The amended complaint contained two claims, the first for six million dollars in actual and punitive damages and the second (on the same averments as the first) for an injunction against the Association cooperating with any groups in other jurisdictions to interfere with the plaintiff in the sale of his book or related activities.

The amended complaint avers the acts of the Association in filing its petition with the New York Supreme Court and in obtaining the judgment and order of that Court adjudging plaintiff in contempt for the unlawful practice of law and enjoining him. The amended complaint avers that the Association acted to prevent plaintiff from criticizing lawyers, judges and courts; that the Association acted to prevent sale of the Book because the public might thereby avoid the services of lawyers; that the Asso-

ciation acted with the intent "maliciously" to deprive the plaintiff of his means of expression and to restrict his constitutional right of free speech; that the Association acted "under color of" State law (42 U.S.C. § 1983) because of the authority given it by the New York statutes to institute the contempt proceeding; and that the Association and its members "conspired" to restrict the constitutional right of plaintiff to free speech.

This motion was then made, the position of the Association being that the amended complaint is insufficient as a matter of law. This position in turn is based on a submission that the Association, when it institutes a proceeding under Judiciary Law § 750, subd. B, has an immunity from suit similar to that of judges and prosecutors, an immunity most recently sustained by the Supreme Court of the United States in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

## II.

Plaintiff bases his action on 42 U.S.C. § 1983, which reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunties secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Plaintiff contends that the Association acted under "color" of New York law because of the provision in Judiciary Law § 750, subd. B authorizing a "bar association" to institute the proceeding to punish for a criminal contempt the unlawful practice of law.

Despite the words of Section 1983 making it applicable to "every person", the Supreme Court has held that legisla-

tors are immune from suit under the section even for acts done with "an unworthy purpose". Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Such immunity is not for the "private indulgence" of legislators but for the "public good" in that legislators may discharge their public duties without fear of "the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives" (341 U.S. at 377, 71 S.Ct. at 788). The Supreme Court directed dismissal in Tenney v. Brandhove for failure of the complaint to state a claim upon which relief could be granted.

The Supreme Court in Pierson v. Ray, above, found that judges were immune from suit under Section 1983 even if alleged to have acted maliciously or corruptly. Again the Court pointed out that the immunity was not given to protect the judge but rather in the public interest so that a judge may decide cases independently and on principle "[without] fear that unsatisfied litigants may hound him with litigation charging malice or corruption" (386 U.S. at 554, 87 S.Ct. at 1218).

The same immunity from suit under Section 1983 is given for the same reason to quasi-judicial officials such as prosecuting attorneys and their assistants. Fanale v. Sheehy, 385 F.2d 866, 868 (2d Cir. 1967); Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966), cert. denied 386 U.S. 1021, 87 S.Ct. 1367, 18 L. Ed.2d 457 (1967).

In this Circuit it was also held on the same principle that a special assistant to the Attorney General of the United States has absolute immunity from suit for malicious prosecution based on presentation of evidence to a grand jury which returned an indictment, even where the complaint averred personal malice and that as part of a malicious conspiracy the defendant had secured his appointment as a special assistant for the specific purpose of prosecuting plaintiff. Yaselli v. Goff, 12 F.2d 396

(2d Cir. 1926), affirmed in per curiam opinion, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). The Court of Appeals stated (12 F.2d at 404, 406, 407):

"A United States attorney, if not a judicial officer, is at least a quasi judicial officer, of the government. He exercises important judicial functions, and is engaged in the enforcement of the law. The reasons for granting immunity to judges, jurors, attorneys, and executive officers of the government apply to a public prosecutor in the performance of the duties which rest upon him. To hold that an attorney of a private client is clothed with absolute privilege, and that a public prosecutor, whose duty it is to enforce the laws of the United States, is not exempt because of what he says and does in the discharge of the duties of his office, is so unreasonable, so contrary to sound public policy, and to the fundamental principles of our jurisprudence, that we cannot accept it.

\*   \*   \*   \*   \*   \*

"In our opinion the law requires us to hold that a special assistant to the Attorney General of the United States, in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury. The immunity is absolute, and is grounded on principles of public policy. The public interest requires that persons occupying such important positions and so closely identified with the judicial departments of the government should speak and act freely and fearlessly in the discharge of their important official functions. They should be no more liable to private suits for what they say and do in the discharge of their duties than are the judges and jurors, to say nothing of the witnesses who testify in a case.

\*   \*   \*   \*   \*   \*

"In our opinion, the reasons which compel us to hold that one who ob-

tains an appointment as a prosecuting officer of the government is immune from civil liability for acts done by him in the discharge of his official duties apply in like manner to protect him against such a charge as that he was governed by improper motives in securing the appointment. The important fact is that he was appointed to the office, and, having been appointed, the public interests require that he shall be free and fearless to act in the discharge of his official duties. If he cannot be charged with acting willfully and maliciously after he gets appointed to the office, no more can he be charged with having conspired to get into the office in order to act willfully and maliciously after he gets his appointment. The one charge is as much to be feared as the other, and is equally derogatory to his public character and usefulness in the office. We are unable to distinguish between the two cases in principle."

A later suit under the civil rights laws came before Judges Learned Hand, Swan and Clark. The defendants were two successive Attorneys General of the United States, two successive directors of the Enemy Alien Control Unit of the Department of Justice and the District Director of Immigration. The complaint alleged that defendants maliciously and from personal ill will and knowing that they were acting unlawfully, deprived plaintiff of his civil rights by keeping him in custody for over four years on the pretext that he was a German enemy alien when they knew him to be French, as the Courts found when he was finally ordered to be freed. The Court of Appeals approved dismissal of the complaint for insufficiency in law because the defendants had absolute immunity from suit. Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). Judge Learned Hand had this to say (177 F.2d at 581):

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen up-

on others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."

The many decisions granting absolute immunity to prosecuting attorneys, clerks of court, curators, and others concerned with the enforcement of the laws or with the judicial function are collected in Bauers v. Heisel, above cited, at 586, footnote 7.

An interesting application, or extension, of the principle is seen in Byrne v. Kysar, 347 F.2d 734 (7th Cir. 1965), cert. denied, 383 U.S. 913, 86 S.Ct. 902, 15 L.Ed.2d 668 (1966). Illinois has a procedure for the confinement of those mentally ill. A petition may be filed by "any reputable citizen" averring that a named person is mentally ill; such petition must state the names of witnesses by whom the facts may be proved, at least one of whom must be a physician having knowledge of the facts. Where jury trial is not demanded, the Court must appoint a commission of two physicians to examine the person and to report to the Court. If found by the commission to be mentally ill, the Court must commit such person. Illinois Revised Statutes, 1967, Chapter 91-½, sections 8–1, 8–7, 8–12 (formerly Ill.Rev.Stat.1963, and 1961, ch. 91-½ §§ 5–1, 5–5, 5–10). Plaintiff alleged that such a petition was filed against him by Barish, an assistant state's attorney; that Dr. Fein and Dr. Imbiorski were the two physicians appointed by the Court to examine plaintiff and to report; that he was thereafter

confined in a mental hospital; that he had never been mentally ill; that Barish, Fein, Imbiorski and other defendants had acted intentionally to deprive him of constitutional rights; and that he had a claim to damages under the civil rights laws, specifically 42 U.S.C. § 1983. The Court found that the two doctors were absolutely immune, saying (347 F.2d at 736):

"Drs. Fein and Imbiorski as members of the court-appointed statutory commission share the court's judicial immunity, and in the performance of their quasi-judicial functions are not subject to suit under the sections of the statute here involved."

With respect to Barish, the Court said (347 F.2d at 736):

" * * * if it be considered that Barish acted in his official capacity as a prosecutor for the state he is afforded the same protection given a judge."

It is clear that, on principle, none of the State judges who decided against plaintiff Dacey could be sued by him under the civil rights laws. It is also clear that if a prosecuting attorney had instituted the proceedings, he also would be absolutely immune from such a suit.

The question here is whether a different result is indicated because the proceedings were instituted, as authorized in the statute, by a "bar association".

### III.

The State of New York has a strong public policy against the practice of law in the State by any person "unless he has been regularly admitted to practice, as an attorney or counsellor, in the courts of record in the state" (Judiciary Law § 484).

The unauthorized practice of law in New York is a misdemeanor, a criminal offense (Judiciary Law § 485). The object of the statute making it an offense to engage in the unauthorized practice of law is "to protect our citizens against the dangers of legal representation and advice given by persons not

trained, examined and licensed for such work * * * ". Spivak v. Sachs, 16 N.Y.2d 163, 168, 263 N.Y.S.2d 953, 956, 211 N.E.2d 329, 331 (1965). It had earlier been said by the highest Court in New York: "Protection of the members of the lay public of our State, when they seek *legal advice* * * * is the basis of the requirements of licensing of attorneys by the State * * * ". In re Roel, 3 N.Y. 2d 224, 231, 165 N.Y.S.2d 31, 37, 144 N.E.2d 24, 28 (1957), appeal dismissed 355 U.S. 604, 78 S.Ct. 535, 2 L.Ed.2d 524 (1958). Still earlier, the highest Court in New York had declared (People v. Alfani, 227 N.Y. 334, 339, 125 N.E. 671, 673 (1919)):

> "The reason why preparatory study, educational qualifications, experience, examination and license by the courts are required, is not to protect the bar, as stated in the opinion below, but to protect the public. Similar preparation and license are now demanded for the practice of medicine, surgery, dentistry, and other callings, and the list is constantly increasing as the danger to the citizen becomes manifest, and knowledge reveals how it may be avoided.

> "Why have we in this state such strict requirements for admission to the Bar? A regents' certificate or college degree, followed by three years in a law school or an equivalent study in a law office, marks the course to a bar examination, which must finally be passed to entitle the applicant to practice as an attorney. Recognizing that knowledge and ability alone are insufficient for the standards of the profession, a character committee also investigates and reports upon the honesty and integrity of the man, and all of this with but one purpose in view, and that to protect the public from ignorance, inexperience, and unscrupulousness."

The Supreme Court of New York has been given power, not only over licensed attorneys, but over "all persons * * * assuming to practice law" (Judiciary Law § 90(2)).

■ The statutory prohibition against the unauthorized practice of law can be enforced in New York in three ways: first, by a criminal prosecution; second, by a civil action under Judiciary Law § 476–a; and third (that employed against plaintiff Dacey), by summary proceedings under Judiciary Law § 750, subd. B to punish for criminal contempt. It has been held that a civil action is appropriate "where disputed issues of fact require a trial" but that "where the facts are undisputed, a summary proceeding may be simpler, more expeditious and more appropriate than either a criminal prosecution or civil action". Application of New York County Lawyers' Ass'n (In re Bercu), 273 App.Div. 524, 78 N. Y.S.2d 209, 212, 213, 9 A.L.R.2d 787 (1st Dept. 1948), affirmed 299 N.Y. 728, 87 N.E.2d 451 (1949). Since the facts in the case involving Dacey were undisputed, the Association proceeded properly in instituting a summary proceeding.

In the First Department, where the proceedings against Dacey were instituted, it is contemplated by the Appellate Division that bar associations, and specifically this defendant Association, will be active in investigating the unauthorized practice of law and, where deemed appropriate, instituting proceedings to stop such practice. A Rule (XII–A) of the Appellate Division, First Department, provides that as to three named bar associations, including this defendant Association, subpoenas shall issue on their application for a preliminary investigation of any person believed to be "unlawfully practicing or assuming to practice law"; that the evidence of witnesses at such investigation may be transcribed; and that such witnesses may be sworn. This Rule has recently been sustained as proper. Matter of A'Hearn v. Committee, etc. of the New York County Lawyers' Ass'n, 55 Misc.2d 540, 285 N.Y.S.2d 744 (Sup.Ct.N.Y.Cty.1967), affirmed 30 App.Div.2d 47, 289 N.Y.S.2d 994 (3d Dept. 1968), appeal pending in the Court of Appeals.

It thus appears that the Association when it acts under Judiciary Law §

750, subd. B is a part of the judicial process of New York. The situation at bar seems exactly the same as that of a bar association sued for damages for its activities under Court Rule which led to the disbarment of a lawyer. This happened in the State of Washington. The lawyer then sued the bar association under the civil rights laws, 42 U.S.C. § 1983. The association was held to have absolute immunity (Clark v. State of Washington, 366 F.2d 678 at p. 681 (9th Cir. 1966)), the Court saying (at 681):

> "As an arm of the Washington Supreme Court in connection with disciplinary proceedings, the Bar Association is an 'integral part of the judicial process' and is therefore entitled to the same immunity which is afforded to prosecuting attorneys in that state."

I am unable to distinguish the situation in *Clark* from that at bar.

The defendant Association has instituted at least two proceedings under Judiciary Law § 750, subd. B which have resulted in final judgments enjoining in specific instances the unauthorized practice of law. Matter of New York County Lawyers Ass'n (In re Bercu), above; In re Roel, above.

It thus appears to be clearly in the public interest that the Association be able to determine, independently and fearlessly, when to institute summary contempt proceedings to stop what it believes to be the unauthorized practice of law. Indeed, it was in the public interest that the Association instituted such proceedings against plaintiff Dacey. True this plaintiff there prevailed but the question was obviously a close one and it is in the public interest that such questions be finally decided, whatever be the decision.

█ Since fear of lawsuits for damages would seriously hamper the Association in making determinations whether or not to institue proceedings to stop what is believed to be the unauthorized practice of law, there is every reason to find that on principle the Association is immune from such suits as that at bar.

IV.

If (contrary to my view) the Association does not have an absolute immunity from suit, it must at least have the same immunity as a peace officer, an immunity described by the Supreme Court of the United States as follows (Pierson v. Ray, above at 555, 87 S.Ct. at 1218):

> "Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved".

The judgment against plaintiff by Mr. Justice Marks affirmed by vote of four justices of the Appellate Division seems conclusive evidence of the existence of probable cause for institution of the proceeding by the Association, despite later reversal of the judgment. Our Court of Appeals has so declared (Salvage Process Corp. v. Acme Tank, etc., Co., 104 F.2d 105, 107 (2 Cir. 1939):

> "The granting of a final injunction, despite reversal on appeal, is conclusive evidence of probable cause".

V.

█ Aside from the first claim for money damages, there is a second claim for an injunction against cooperation by the Association with groups in other jurisdictions to obtain relief similar to that sought in New York. This claim must fail for the reason that there are no averments that the Association is in any way threatening any such action.

The motion is granted and the Clerk is directed to enter judgment dismissing the action for failure of the amended complaint to state a claim upon which relief can be granted.

So ordered.