Norman F. DACEY and Norman F. Dacey, doing business as National Estate Planning Council, Appellants,

v.

NEW YORK COUNTY LAWYERS' ASSOCIATION, Appellee.

Nos. 109–110, Dockets 33024–33025.

United States Court of Appeals Second Circuit.

Argued Oct. 7, 1969.

Decided Dec. 8, 1969.

Certiorari Denied May 25, 1970. See 90 S.Ct. 1819.

Arthur Stephen Penn, New York City, for appellants.

Arthur J. Goldberg, New York City (Arthur L. Liman and Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, on the brief), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The orderly functioning of our judicial system and the protection of our citizens require that legal advice should be offered only by those who possess the requisite qualifications and authorization for the practice of law. At the same time, one of the most fundamental principles of our system of government prohibits any restraint on a citizen's right to disseminate his views on important public issues. In this case, we are called upon to resolve a conflict between these two important interests. Judge Wyatt's principal ground for dismissing the complaint was that the doctrine of immunity was an absolute bar to this litigation. We must therefore determine whether a bar association has immunity in a civil action arising out of its attempt to restrict the distribution of a book in the exercise of its statutory power to initiate prosecutions for the unauthorized practice of law.[1]

### I. Facts

Plaintiff Norman Dacey, who is not an attorney, published a book bearing the title *How To Avoid Probate!* The book was highly successful. It enjoyed a long run on the best-seller list and a sale of more than 750,000 copies. *How To Avoid Probate!* begins with a five-page critique of the probate court system and of the lawyers who maintain and tolerate its continued existence. The criticism consists mostly of quotations from academics or the popular press and of anecdotes concerning individuals whose experiences with the probate system have been particularly unsatisfactory. Dacey sets forth illustrations of conflicts of interest on the part of probate judges and probate attorneys, of exorbitant fees charged by special guardians and court-appointed appraisers.

Having made his case that "probate" should be avoided, Dacey goes on to suggest that it is possible, indeed, easy to do so. In a few pages, he characterizes the

---

1. We find somewhat mystifying the statement of our brother Moore that in this case there is "no issue of 'restraint on a citizen's right to disseminate his views on important public issues.'" Our brother Moore concedes that the issue before us is whether "upon the facts alleged in the amended complaint" the Association is immune from suit by Dacey. One of the facts alleged in the amended complaint is that the Association's institution of proceedings against Dacey restrained him from expressing his views on an important public issue.

revocable *inter vivos* trust as "a legal wonder drug," "a magic key to probate exemption." The remainder of the book's 360 pages consists largely of forms for trusts and wills, all of which are provided in duplicate, and accompanying instructions for their use.[2] The implicit suggestion is that through the use of these forms an individual may preserve almost all of his property from what Dacey views as the ravages of the probate system.

In January 1967, acting under authority conferred upon it by § 750, subd. B of New York Judiciary Law, McKinney's Consol.Laws, c. 30,[3] the defendant New York County Lawyers' Association instituted a proceeding to have Dacey, his publisher, and two booksellers adjudged in criminal contempt for the unauthorized practice of law and to have the sale and distribution of *How To Avoid Probate!* enjoined.[4] After a hearing, a Special Term of the New York Supreme Court refused to hold the publisher and booksellers in contempt but did adjudge Dacey in contempt and enjoin the sale and distribution of his book. New York County Lawyers' Ass'n v. Dacey, 54 Misc.2d 564, 282 N.Y.S.2d 985 (Sup.Ct.1967). Two months after the decision of the New York Supreme

Court, Dacey brought this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that the commencement by the Association of criminal contempt proceedings for the unauthorized practice of law deprived him of his first amendment right to free speech, and requested that the Association be enjoined from further prosecution of the state court proceeding. Judge McLean denied Dacey's motion for a preliminary injunction, finding neither irreparable injury nor a strong probability that Dacey would prevail at trial.

Meanwhile Dacey had been pursuing his state court appeals from the decision of the New York Supreme Court. He was unsuccessful in the Appellate Division, which in October 1967 upheld the Supreme Court in a four-to-one decision, Justice Stevens dissenting. New York County Lawyers' Ass'n v. Dacey, 28 A.D. 2d 161, 283 N.Y.S.2d 984 (1967). Two months later, however, the New York Court of Appeals reversed, one justice dissenting, on the reasoning of Justice Stevens' dissenting opinion in the Appellate Division. New York County Lawyers' Ass'n v. Dacey, 21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459 (1967). In concluding that the sale and distribution of *How To Avoid Probate!* did not

2. The only textual matter in the final 345 pages of the book other than explanations of the forms and instructions for their use is a three-page epilogue, in which Dacey restates his indictment of lawyers and the legal system.

3. Section 750, subd. B provides:
   In addition to the power to punish for a criminal contempt as set forth in subdivision A, the supreme court has power under this section to punish for a criminal contempt any person who unlawfully practices or assumes to practice law; and a proceeding under this subdivision may be instituted on the court's own motion or on the motion of any other officer charged with the duty of investigating or prosecuting unlawful practice of law, or by any bar association incorporated under the laws of this state.

4. The initiation of criminal contempt proceedings under § 750, subd. B was not

the only weapon available to the Association. Alternatively, it could have requested that Dacey be prosecuted for the unauthorized practice of law, a misdemeanor under New York Judiciary Law § 485. Finally, under New York Judiciary Law § 476–a, it could have filed a complaint with the attorney general, requesting that he commence a civil action against Dacey. Had the attorney general failed to take action on this request or declined to institute proceedings, the Association could then have applied to the New York Supreme Court for permission to maintain the action itself. Thus, in both of these alternative proceedings, some public official, either the court or the state attorney general, must approve the Association's decision that prosecution for unauthorized practice is warranted before proceedings may be instituted.

constitute the unauthorized practice of law, Justice Stevens had emphasized that the book was sold to the public at large and that no relationship of personal trust and confidence arose between Dacey and the purchasers of his book.

Fortified by his victory in the New York Court of Appeals, Dacey pressed forward vigorously in his federal court action. In an amended complaint he abandoned his now unnecessary request for a permanent injunction and substituted a demand for $1,500,000 in compensatory damages and $4,500,000 in punitive damages. He also sought to restrain the Association from cooperating with any other organization in an attempt to prevent the distribution of his book on the Association's asserted ground that it constituted the unauthorized practice of law. On October 9, 1968, however, Judge Wyatt granted the Association's motion, pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, to dismiss Dacey's amended complaint for failure to state a claim on which relief could be granted. Judge Wyatt concluded that immunity from suit shielded the Association from Dacey's claim for damages. He reasoned that because the Association was performing a prosecutorial function conferred upon it by statute in initiating the contempt proceedings for unauthorized practice against Dacey, it should occupy the same immune status accorded by law to a government prosecutor. Moreover, the district judge held that the Association could avail itself of the defense of "probable cause" and that the grant of a final injunction by the New York Supreme Court and affirmance by the Appellate Division, despite the ultimate reversal by the Court of Appeals, established probable cause for the Association's actions as a matter of law.

It should be emphasized at this juncture that we are not here concerned with the merits of this action. As this is an appeal from an order granting a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, we are concerned only with the factual allegations of the complaint, and these we must accept as true. Murray v. City of Milford, 380 F.2d 468 (2d Cir. 1967); see Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); 2A J. W. Moore, Federal Practice ¶ 12.08, at 2266–67 & n. 3 (2d Ed. 1968). Accordingly, although the Association apparently never attempted to enforce its injunction against Dacey during the pendency of his appeals, we must assume the validity of Dacey's allegations that the mere existence of the injunction had prevented reprinting, distribution and sale of his book and inhibited the expression of the views he was espousing.

## II. *Immunity*

At common law, judges could not be held liable in a civil action for acts they performed in the exercise of their judicial functions. Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871). The only exception to this strongly rooted rule of judicial immunity arose when a judge took action in cases over which his court clearly lacked subject-matter jurisdiction. Otherwise, it mattered little that his decision was egregiously wrong or that his motives were black. In Yaselli v. Goff, 12 F.2d 396 (2d Cir. 1926), aff'd per curiam, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), we extended the doctrine of immunity to shield a Special Assistant to the Attorney General of the United States from an action for malicious prosecution. Goff, the Special Assistant, was alleged to have secured appointment as a prosecutor in order to further his malicious design to indict and punish the plaintiff. The absolute immunity we granted to public prosecutors in that case was based on what we believed to be sound considerations of public policy. "[P]ersons occupying such important positions and so closely identified with the judicial departments of the government," Judge Rogers reasoned, "should speak and act fearlessly in the discharge of their important official functions." "They should be no more liable," he continued, "to private

suits for what they say and do in the discharge of their duties than are the judges and jurors, to say nothing of the witnesses who testify in a case." 12 F.2d at 406.

■■ Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, which creates liability for the deprivation of rights under color of law and upon which Dacey bases his action, did not abolish the settled principle of judicial immunity. The Supreme Court has clearly instructed that, in the absence of a specific congressional rejection of the doctrine, the immunity of judges for acts within the judicial role must be considered to have survived the enactment of the Civil Rights Act. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). More recently, this court again gave its approval to the extension of the immunity granted to judges, to encompass prosecutors. Fanale v. Sheehy, 385 F.2d 866 (2d Cir. 1967). A public prosecutor thus possesses the same immunity in an action which seeks to hold him personally liable for official acts under § 1983 as he does to a similar action for malicious prosecution.[5]

## III. *The Prosecutorial Role of the Association*

We are of the view that when the Association instituted its proceedings against Dacey, its role was analogous to that of a public prosecutor.[6] But this is not the end of our inquiry. Chief Judge Learned Hand concluded that the decision to grant immunity to public prosecutors arose from "a balance between the evils inevitable in either alternative." Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). To decide whether immunity should be extended to a private association performing a prosecutorial function we must strike a similar balance between the interests involved. In analyzing these interests, we discern facets to this case which cause us to pause and question the wisdom of allowing the Association to find sanctuary in the doctrine of immunity on the facts alleged in the complaint.

■ The objective and effect of instituting criminal contempt proceedings for the unauthorized practice of law against Dacey were to suppress a book.[7] The gravamen of the Association's complaint against Dacey was not that he had

---

5. Many judges have expressed doubts over the wisdom of extending immunity to shield prosecutors from civil liability under § 1983. Two members of this court's panel which decided Fanale v. Sheehy, *supra*, believed that if they were writing on a clean slate "there would be some situations * * * in which even 'official' acts of a prosecuting officer should not be protected by absolute immunity from civil liability." 385 F.2d at 869 (Waterman and Feinberg, JJ., concurring). There was a similar division of opinion in the Third Circuit's *en banc* decision to extend immunity to prosecutors. Bauers v. Heisel, 361 F.2d 581, 592–594 (3d Cir. 1966) (Hastie, J., concurring; Biggs and Freedman, JJ., dissenting), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967).

6. That the prosecutorial role of the Association is not general but limited to the enforcement of New York's prohibition of the unauthorized practice of law does

not affect our decision; the Special Assistant to the Attorney General whom we cloaked with immunity in Yaselli v. Goff, *supra*, was empowered to conduct only a single investigation.

7. Although only one of the five paragraphs of the injunction referred specifically to the sale and distribution of "writings," the Association never presented any evidence of acts performed by Dacey within the jurisdiction of the state of New York other than the sale and distribution of *How To Avoid Probate!* which might support a prosecution for unauthorized practice. We therefore accept the manner in which Justice Stevens framed the issue: "the question may be briefly and baldly expressed: Does the writing, publication, advertising, sale and distribution of 'How to Avoid Probate!' constitute the unauthorized practice of law within the meaning of Section 750(B)?" 283 N.Y.S.2d at 997.

given specific advice to specific individuals concerning their particular legal problems. Instead, the Association acted to prevent Dacey from disseminating his views to the public generally by means of the publication and distribution of a book. Moreover, the book at which the attack was directed contained a critical discussion of an important public institution—the probate court—and of the officials who administer it and practice before it.

The first amendment embodies "a profound national commitment to the principle that debate on public issues [such as the performance of the probate court system] should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964). The value of Dacey's views is not lessened because they were presented principally in the form of quotations and anecdotes. Judging from the wide circulation which the book received, this format was extremely effective. Nor does it matter that the opinions expressed were contained in a book comprised largely of legal forms. The argument Dacey sought to press upon the public—the virtue of which we do not pass upon—was that the infirmities of the probate system required every thoughtful person to avoid the administration of his estate by the probate court.

Given this viewpoint, the forms which comprised the bulk of *How To Avoid Probate!* buttressed Dacey's argument that the goal he advocated was not only desirable but feasible. Dacey's book was therefore protected by the first amendment's guarantee of free speech and any attempt to suppress it on the ground that it constituted the unauthorized practice of law must be scrutinized with extreme care. This is not to say, however, that the inhibiting effect of the Association's action on protected speech is dispositive of the issue before us. An overzealous public prosecutor may create an unjustified restraint on expression by bringing a completely unwarranted prosecution for obscenity and still be immune from damages in a civil action. Thus, although the restriction on freedom of expression induced by the Association's attempt to prevent the distribution of Dacey's book to the public does not completely resolve the question in this case, it is an important factor to be weighed in the balance.[8] And, it provides a context within which the actions of the Association must be viewed.[9]

Dacey urges that the intended result of the Association's action was to eliminate an actual or potential competitor of its members. In initiating unauthorized practice proceedings, he argues, the members of the Association were directly

---

**8.** As we have stated, at common law a judge retained his immunity even if his decision was clearly incorrect; he lost his immunity only if he decided a case over which his court clearly lacked subject matter jurisdiction. Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871). This distinction between a mere excess of jurisdiction and a clear absence of jurisdiction has been applied to prosecutors as well as judges. Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966) (*en banc*), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967).

It would thus be possible to deny the Association immunity on the ground that it clearly lacked jurisdiction to impede the dissemination of ideas to the public generally. However, in our view, the distinction between a lack of jurisdiction and an excessive use of jurisdictional power is artificial and overly conceptual.

Whether the Association may successfully claim immunity in this case should depend not on the formal characterization of its actions, or the "pigeonhole" into which they fall, but rather on the relative weight of the interests which its actions furthered and those which it frustrated.

**9.** It is upon this ground that we distinguish the decision of the Court of Appeals for the Ninth Circuit in Clark v. Washington, 366 F.2d 678 (9th Cir. 1966). In *Clark* a bar association was granted immunity in an action brought under the Civil Rights Act by an attorney whom the association had succeeded in disbarring. Clark was disbarred for two violations of the Canons of Professional Ethics; he made no allegation that the disbarment proceeding had restrained him from expressing his views on public issues.

serving their own pecuniary interest in a manner in which a public prosecutor who begins a case or a judge who decides it is not. We need not pass judgment on the merits of these contentions. We merely note the inevitable presence of a possible conflict of interest between the purposes served by the Association and its conception of the public interest whenever it exercises its statutory power to initiate contempt proceedings under § 750, subd. B and secures an injunction against the sale and distribution of a book critical of the profession.

Finally, we note that at the summary hearing held before the New York Supreme Court in April 1967, only argument of counsel was heard; there was no inquiry into the facts, nor was any evidence presented that Dacey's book had misled anyone.[10]

For all of these reasons, we conclude that it would be unwise to grant the Association immunity in this case. We do not suggest, however that immunity would be unavailable to the Association in a case in which it had sought to enjoin an unauthorized practitioner from proffering to specific individuals legal advice relating to their specific problems or had instituted proceedings to disbar an attorney.[11]

Our decision on this appeal, however, does not rest on our disposition of the issue of immunity.

10. As we have noted above, see note 4, instead of commencing summary contempt proceedings, the Association could have requested the Attorney General to begin a civil action against Dacey under § 476-a of the New York Judiciary Law. Both parties make much of a statutory immunity applicable to unauthorized practice proceedings brought under § 476-b. Section 476-b of the New York Judiciary Law provides that a bar association shall not be liable for certain damages sustained as a result of maintaining a civil action under § 476-a. Dacey contends that the absence of a similar provision in § 750, subd. B suggests that the Association has no immunity to a claim for damages arising out of its initiation of summary contempt proceedings under that section. This contention rests on a misreading of § 476-b. That section allows the plaintiff in a civil action brought under § 476-a to secure a temporary restraining order, a form of relief unavailable under § 750, subd. B, and releases him from the usual requirement of posting a bond before a restraining order may be issued and from liability for damages sustained by reason of the issuance of a restraining order which is later determined to have been unwarranted. Since a bar association cannot secure a temporary restraining order in contempt proceedings initiated pursuant to § 750, subd. B, there is no reason why that section should contain a specific immunity provision comparable to that set forth in § 476-b.

On the other hand, contrary to the contentions of the Association, a bar association's immunity from claims for damages resulting from a temporary restraining order secured under §§ 476-a, 476-b does not require that it be granted a similar immunity from damages which flow from the sanctions imposed under § 750, subd. B. Since a bar association may not commence an action under § 476-a without the approval of the attorney general or the New York Supreme Court, it is likely that unwarranted prosecutions for unauthorized practice will be initiated under that section than under § 750, subd. B.

11. Our brother Moore suggests that the majority has based its decision on irrelevant considerations. As we understand his concurrence, the charge of "irrelevancy" is not directed at the entire discussion of the immunity issue, but at our analysis of Dacey's first amendment rights and the possible conflict of interest inherent in the Association's prosecutorial role. Our decision represents a refusal to extend the doctrine of immunity to encompass the situation before us on this appeal, and the discussion concerns those factors which distinguish this case from others in which the doctrine has been applied. Nor do we understand how our statement that the result we reach today may not obtain in different factual contexts can be construed as an "advisory opinion." It is the antithesis of an advisory opinion; we are specifically disclaiming any attempt to decide controversies not presently before us.

## IV. *Probable Cause*

Just as the public's interest in having access to Dacey's criticism of the courts of probate prevents us from granting absolute immunity to the Association in this case, an equally strong public interest in preventing the unauthorized practice of law requires that the defense of "probable cause" to initiate a prosecution under § 750, subd. B be available to the Association. We believe that failure to afford the Association this defense might well preclude vigorous enforcement of the laws prohibiting unauthorized practice. In such event, the Association would be compelled to proceed with excessive timidity and restrict its prosecutions only to those cases in which the violation was clear beyond all doubt.

Accordingly, we agree with the conclusion of the district court that, as a matter of law, the Association had probable cause to initiate unauthorized practice proceedings against Dacey. The Association's request for a permanent injunction was granted by the New York Supreme Court and affirmed by the Appellate Division before Dacey ultimately prevailed in the Court of Appeals. The law is clear in this circuit that the "granting of a final injunction, despite reversal on appeal, is conclusive evidence of probable cause." [12] Salvage Process Corp. v. Acme Tank Cleaning Process Corp., 104 F.2d 105 (2d Cir.), cert. denied, 308 U.S. 599, 60 S.Ct. 131, 84 L.Ed. 501 (1939). The judgment of the district court is therefore affirmed.[13]

WATERMAN, Circuit Judge (concurring):

I concur in affirming the dismissal of the complaint. I agree with my brother Kaufman and with the court below, Dacey v. New York County Lawyers' Association, 290 F.Supp. 835, 842 (D.C.1968) that the Association, as a matter of law, had probable cause to initiate unauthorized practice proceedings, and therefore that the dismissal of the action which is based upon the Civil Rights Act of 1871, 42 U.S.C. § 1983, was proper. In his concurring opinion my brother Moore also accepts this ground as a dispositive one.

I agree with Judge Kaufman that due respect for the First Amendment cautions us that it would be unwise to affirm the judgment below upon the added ground relied upon by the district court and by Judge Moore that in the circumstances here the Association is clothed with the immunity from suit enjoyed by New York State public prosecutors. It is clear that the objective of the Association in instituting its special proceedings in the New York courts against Dacey, a non-lawyer, was to suppress his book "How to Avoid Probate!" and to prevent the views expressed therein from being available to the general public.

I am unable to reconcile a desire to have "book burning" judicially approved because a non-lawyer's book contains derogatory remarks about our profession with the power to prosecute for unauthorized practice of the profession. Indeed, I heartily approve of this grant of

---

12. Dacey urges that the grant of a final injunction should not be considered to be conclusive evidence of probable cause and consequently demands a hearing on the issue of probable cause. He bases his arguments on the Supreme Court's decision in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), that a conviction at trial did not automatically establish that a peace officer had probable cause to make the arrest which led to the conviction.

Since this case involved no ex parte restraint on Dacey's liberty, we find the analogy to malicious prosecution far more compelling than any analogy to

false arrest. As we stated, in an action for malicious prosecution, the granting of a final injunction conclusively establishes the defense of probable cause. Salvage Process Corp. v. Acme Tank Cleaning Process Corp., *supra*.

13. In addition to damages, Dacey sought to enjoin the Association from cooperating with any other bar association in an attempt to restrict the distribution of his book. Given the absence of any showing that the Association was contemplating any such action, Judge Wyatt's dismissal of this claim was entirely proper.

power to the Association for it is necessary to repose it in those learned in the law if our profession is to preserve its great ideals through membership therein of none other than those indviduals qualified by learning and training to render personalized legal professional service. Non-lawyers should not be permitted to render that service.

MOORE, Circuit Judge (concurring in the result):

Although I concur in the affirmance of the judgment dismissing the complaint, my reasons for so doing are quite different from those expressed in the majority opinion. Initially I find here no issue of "restraint on a citizen's right to disseminate his views on important public issues * * *." Upon this appeal the only issue before us is: does the amended complaint on its face state a cause of action? Nor is there any issue as to whether Dacey's acts constitute the unlawful practice of law. That issue has been laid at rest by the New York Court of Appeals. No judge is being sued—hence, judicial immunity is not involved. The issues of free speech and the suppression of a book or of Dacey's "views to the public generally by the means of the publication and distribution of a book" are not before us. The only question stated more extensively is: is the Association upon the facts alleged in the amended complaint immune from actionable suit by Dacey for having proceeded (ultimately unsuccessfully) against him for the unauthorized practice of law?

No answer has been interposed. No "defense" of immunity has been pleaded. Therefore the failure to state a claim must be found in the nature of the suit itself—in effect, the disclosure of facts from which a built-in immunity may be derived. The decisions leave no doubt that such immunity may be presented upon the motion to dismiss.[1]

Looking at the amended complaint itself, despite Dacey's allegations that the Association's proceedings "were undertaken by defendant solely for the purpose of preventing the plaintiff from criticizing and speaking out in opposition to the practices of certain lawyers, judges and courts whose management of decedents' estates was improper" and to prevent the sale of his book, the amended complaint adequately discloses that the Association sought to and did for a period of time enjoin Dacey from the unauthorized practice of law. The motives, the purposes, the conspiracy and the malice allegedly may all be assumed. In fact it is into these very motives and purposes that Dacey would seek to probe upon a trial. And it is for this very reason that the courts so uniformly have erected a barrier for the public good against such a happening.

Whence is derived this immunity claim by the Association? The Legislature has seen fit to grant the right to institute a proceeding against unlawful practice to court, other officer or any bar association. The means whereby such an association may proceed are pointed out by the court below, i. e., (1) by criminal prosecution; (2) by a civil action under Judicial Law § 476–a; and (3) by summary proceedings under § 750, subd. B. Where as here the relevant facts are undisputed, namely, the proceedings themselves, the § 750, subd. B approach was warranted. Dacey argues that § 476–a should have been used so that the Attorney General could have decided whether in his opinion the complaint was well founded and whether a proceeding should be commenced; and that only by this procedure could immunity under § 476–b be achieved. However, the immunity section was added to § 476 merely to eliminate the potential liability against which a bond was required in the event that a temporary restraining order was desired. As the Attorney General at the time (1958) stated in his memorandum to the

---

1. Bauers v. Heisel, 361 F.2d 581 (3d Cir. 1966) (see footnote 7 of *Bauers*, page 586, for citations of 47 cases relevant to the immunity question); Byrne v. Kysar, 347 F.2d 734 (7th Cir. 1965).

Legislature, "in prosecuting such [unauthorized practice] actions bar associations are therefore performing the same public functions as the Attorney General or any other public law enforcement official. \* \* \* It is only just and proper that when a bar association functions as a law enforcement agency, under statutory authority, it should enjoy the same immunity from liability for costs and damages as that extended elsewhere in the law to public officials performing the same duties." (New York State Leg. Annual 1958, p. 11.) Since the Legislature has equated bar associations with courts and prosecuting officers, the law applicable to them should be equally applicable to the Association here.

The Association in previous proceedings has been recognized in its prosecutorial role. In re Bercu, 273 App.Div. 524, 78 N.Y.S.2d 209 (1st Dept.1948), aff'd 299 N.Y. 728, 87 N.E.2d 451; In re Roel, 3 N.Y.2d 224, 165 N.Y.S.2d 31, 144 N.E.2d 24 (1957), app. dism. 355 U.S. 604, 78 S.Ct. 535, 2 L.Ed.2d 524 (1958). Dacey's fear of the Association acting as a vigilante committee cannot be reconciled with the vigilante concept which normally embraces the thought of apprehension, trial and execution of judgment, all by the vigilantes. In marked contrast, Dacey has been afforded every step of due process in the courts. The cases, therefore, involving police officers have no bearing as precedential value on the decision here.[2]

What Dacey desires is "his day in court to test the motives of the defendant-appellee [the Association] in using the procedure it chose, on such a novel issue before a hostile court."[3] (Dacey brief p. 13.) But this "day" (if he wishes to test the motives of the committee or the members of the largest local bar association in the United States, the "day" could become weeks or months) in court is exactly what the courts have decided is not in the public interest.

A few sentences from decisions, in which the courts have had to cope with arguments similar to those now advanced by Dacey, will suffice as a guide to the correct result here. The recognition of a common law immunity for judges from tort actions was made by the United States Supreme Court in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871). Justice Field's opinion justifies the privilege in terms of freedom from "vexatious litigation" and "apprehension of personal liability" that would hamper judges in the discharge of their judicial functions. The immunity was described as being

"not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." 80 U.S. (13 Wall.) at 350, quoting from Scott v. Stansfield, L.R. 3 Ex. 220, 223 (1868).

In Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), the Court granted a similar absolute privilege to

---

2. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court reversed the dismissal of an action against state police officers. A cause of action was found to be stated under § 1 of the 1871 Civil Rights Act, 42 U.S.C. § 1983. In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the immunity of state police officers was considered. The common law had never granted an absolute immunity to police officers, but did allow the defense of good faith and probable cause. Since the same considerations present in common law actions were present in § 1983 actions, the Court

held that the defense was available to police officers sued under § 1983. 386 U.S. at 555, 557, 87 S.Ct. 1213.

3. Presumably Dacey refers to the five judges (Special Term and four Appellate Division) who ruled against him because he stated " \* \* \* it is not unlikely that many of the judges who held against Dacey in the lower courts of New York, were themselves members of the New York County Lawyers Association." (Dacey brief p. 13.) Yet Dacey and his attorney did not suggest disqualification or even hostility on the part of Judge Wyatt, who advised them of his membership in the Association.

the Postmaster General in a defamation action.

The Second Circuit has long recognized the need to extend the immunity granted to judicial officers to public prosecutors.[4] In Yaselli v. Goff, 12 F.2d 396 (2d Cir. 1926), aff'd per curiam 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), a Special Assistant to the Attorney General, who had been appointed to prosecute the plaintiff, was alleged to have prosecuted an indictment maliciously and without probable cause. This Court held that:

> "[A] special assistant to the Attorney General of the United States, in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury. The immunity is absolute, and is grounded on principles of public policy. The public interest requires that persons occupying such important positions and so closely identified with the judicial departments of the government should speak and act freely and fearlessly in the discharge of their important official functions. They should be no more liable to private suits for what they say and do in the discharge of their duties than are the judges and jurors, to say nothing of the witnesses who testify in a case." 12 F.2d at 406.

In the front rank of cases establishing an immunity from common law actions for malicious prosecution is Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). In dismissing this suit against two successive Attorneys-General of the United States, two successive Directors of the Enemy Alien Control Unit of the Department of Jus-

tice, and the District Director of Immigration at Ellis Island, Chief Judge Learned Hand stated:

> " * * * to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." 177 F.2d at 581.

The justification given for immunity involved a balancing of the evils that were inevitable in either alternative. This balancing revealed that it was:

> "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." 177 F.2d at 581.

Where a court-appointed commission of two doctors is authorized by statute, immunity has been extended to them even though the plaintiff in his suit had alleged that by the defendants' intentional actions he had been illegally committed and that, therefore, he was entitled to damages under the civil rights laws. The Seventh Circuit said:

> "Drs. Fein and Imbiorski as members of the court-appointed statutory commission share the court's judicial immunity, and in the performance of their quasi-judicial functions are not subject to suit under the sections of the statute here involved." Byrne v. Kysar, 347 F.2d 734, 736 (1965), cert. denied 383 U.S. 913, 86 S.Ct. 902, 15 L.Ed.2d 668 (1966).

The entire purpose of immunity would be defeated if an allegedly aggrieved plaintiff by charges of malice and self-interest by a bar association could subject its members, or a committee thereof, to a trial in an endeavor to probe into

---

4. The most relevant and recent case in this area is the decision by this Court in Fanale v. Sheehy, 385 F.2d 866 (1967), in which it was stated:
   "If, then, as we hold, the complaint's allegations as to [a county district at-

torney] are confined to official action, he, too, is entitled to immunity." 385 F.2d at 868.

such motives. In *Gregoire* the Court stated:

"[I]t can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him." 177 F.2d at 581.

Even though these common law immunities are called "absolute," there have always been limitations placed upon them. Common formulations of that limitation have included the requirement that "the official's act must have been within the scope of his powers," *Gregoire, supra,* and that "a distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject matter," *Bradley, supra,* 80 U.S. (13 Wall.) at 351. Thus, any limitation must be understood in terms of the scope of the official's duties, and not in terms of either any malice which might have motivated the official or any lack of probable cause which might have justified the action. But here there is no question that the action of the Association was within the scope of the powers bestowed by § 750, subd. B of the Judiciary Law. Mr. Justice Frankfurter answered Dacey's present argument, seeking to obtain a trial, in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) wherein he said:

"The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. * * The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives" (377, 71 S.Ct. 788).

In the *Tenney* case, a committee of the legislature had acted but here statutory authority has been expressly bestowed upon bar associations. Thus the admonition in *Tenney* is applicable, namely:

"The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province" (378, 71 S.Ct. 789).

Nor can any legal distinction be derived from the difference between action by an integrated bar and the statutorily authorized Association. Therefore the grant of immunity against a suit by a disbarred attorney is most relevant here.[5] As to such a suit under civil rights laws, the Ninth Circuit said:

"As an arm of the Washington Supreme Court in connection with disciplinary proceedings, the Bar Association is an 'integral part of the judicial process' and is therefore entitled to the same immunity which is afforded to prosecuting attorneys in that state." Clark v. State of Washington, 366 F.2d 678, 681 (9th Cir. 1966).

Thus, in my opinion, the decisions support the syllogism that (1) the ju-

---

5. The majority would distinguish the decision in Clark v. Washington, 366 F.2d 678 (9th Cir. 1966) by relying upon the absence of the "allegation that the disbarment proceeding had restrained [the disbarred attorney] from expressing his view on public issues." It should be noted that the allegations of a deprivation of constitutional rights under the Fourth, Eighth and Fourteenth Amendments did not prevent the Ninth Circuit from finding absolute immunity for the Bar Association.

diciary is immune from liability for damage claims brought under § 1983, (2) public prosecutors are quasi-judicial officials, (3) the Association is performing the same role as a public prosecutor here, therefore, (4) the Association is immune in this case upon the facts as pleaded.

The District Court, therefore, correctly granted absolute immunity because "the Association when it acts under Judiciary Law § 750, subd. B is a part of the judicial process." 290 F.Supp. 841–842 (S.D.N.Y.1968). This conclusion is uniformly supported by the decisions of the New York courts and the United States Supreme Court.

In view of the nature of the narrow issue before us, I must take issue with that portion of the majority's opinion entitled "III. The Prosecutorial Role of the Association," first, because it does not reflect the existing pertinent law and, second, because in my opinion it is entirely irrelevant to the only question before us. The law as to immunity as thus far written does not depend upon a finding by an appellate court that it would be "unwise to grant the Association immunity in this case" or because its concept of the public's interest "prevents [it] from granting absolute immunity to the Association in this case." Such a hypothetical situation is not before us. Nor should we give advisory opinions as to such future situations as may arise with respect to the giving of unauthorized advice to "specific individuals." Furthermore, the hypothesis that "an overzealous public prosecutor may

create an unjustified restraint on expression by bringing a completely unwarranted prosecution for obscenity and still be immune from damages in a civil action" is no justification for lessening the immunity privilege. I find no relationship between the public policy involved in granting to the Association the power to protect against the unauthorized practice of the law and any inhibition of free speech.[6] And I do not accept "the inevitable presence of a possible conflict of interest between the purposes served by the Association and its conception of the public interest whenever it exercises its statutory power to initiate contempt proceedings under § 750, subd. B." Nor are wrongfulness or malice determining factors because allegedly wrongful acts were present in the analogous complaints dismissed for failure to state a claim. Thus I would hold that the Association upon the facts pleaded in the amended complaint is entitled to absolute immunity from Dacey's suit.

Since, however, the law in this Circuit is that the "granting of a final injunction, despite reversal on appeal, is conclusive evidence of probable cause," Salvage Process Corp. v. Acme Tank Cleaning Process Corp., 104 F.2d 105, cert. denied 308 U.S. 599, 60 S.Ct. 131, 84 L.Ed. 501 (1939), and since this fact appears in the amended complaint, I accept this ground for dismissal of the amended complaint despite my belief that there is inconsistency in denominating "probable cause" a "defense" on a motion to dismiss for failure to state a claim.

---

6. The majority say that "The objective and effect of instituting criminal contempt proceedings for the unauthorized practice of law against Dacey were to suppress a book" and that "the Association acted to prevent Dacey from disseminating his views to the public generally by means of the publication and distribution of a book." By these assumptions, the majority would create

"free speech" issues. The injunction against the sale of his book, although ultimately reversed by the New York Court of Appeals, was a consequence of the state trial court's finding that it constituted the unauthorized practice of law. Therefore, it would seem fallacious to construe the mere institution of such a proceeding as an act to suppress criticism of existing probate practices.